Jack Jeffrey McCRACKEN, Appellant,

v.

STATE of Alaska, Appellee.

No. 1498.

Supreme Court of Alaska.

April 8, 1974.

Jack Jeffrey McCracken, in pro. per., and H. John DeNault, III, Anchorage, for appellant.

Douglas B. Baily, Sp. Prosecutor, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR and BOOCHEVER, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Jack McCracken appeals from his conviction and sentencing on two counts of shooting with intent to kill and two counts of use of a firearm during an assault.

Prior to trial, McCracken submitted a motion to peremptorily disqualify the trial judge, but the court denied this motion as being untimely made. McCracken also submitted a motion to retain an expert witness on paraffin tests with costs to be borne by the State of Alaska. The State

filed opposition to this motion and, following a hearing, the court determined that McCracken had not demonstrated sufficient need for an expert witness. The trial court thus denied McCracken's motion without prejudice, inviting McCracken to make a further showing as to how the testimony of an expert witness would contribute to his defense. No such further showing was made.

McCracken was tried on the charges of shooting with intent to kill and assault with a firearm. At trial the State presented the testimony of the two victims of the shooting at the Polar Bar in Anchorage, both of whom made in-court identifications of McCracken as their assailant. The State also introduced physical evidence connecting McCracken with the charged offenses.[1]

The jury returned verdicts of guilty on all four counts. The superior court imposed 20-year sentences on each count of shooting with intent to kill and ordered the sentences to run consecutively. The court further imposed 10-year sentences for each count of use of a firearm during an assault, these sentences to run concurrently with the 20-year sentences.

In this appeal McCracken submits five specifications of err:[2] (1) that a post-in-dictment confrontation with the victims of the shooting that took place at a parole revocation hearing violated both the right to counsel and the due process guarantee of the United States and Alaska Constitutions; (2) that the superior court's denial of the pre-trial motion to employ an expert witness at the State's expense violated both his right to compulsory process to secure witnesses and his right to effective assistance of counsel; (3) that he was deprived of the effective assistance of counsel; (4) that the trial court abused its discretion in denying a pre-trial motion to peremptorily disqualify the trial judge, thereby depriving him of a fair trial; and (5) that the sentence imposed by the trial court violated the prohibition against double jeopardy found in both the United States and Alaska Constitutions.

McCracken's initial specification of error is that a post-indictment identification during a parole revocation hearing violated the right to counsel and due process guarantees found in both the United States and Alaska Constitutions,[3] and that this violation mandates reversal of his conviction.

The fundamental guidelines for assessing the propriety of post-indictment identifications are delineated in United States v. Wade[4] and Stovall v. Denno.[5]

1. One of the victims of the shooting, Danny Patterson, testified that after shooting him, McCracken came behind the bar and a struggle ensued. In the course of this struggle bottles were broken and Patterson managed to throw his assailant to the ground and flee. The State introduced evidence that the clothes that McCracken was wearing at the time of arrest contained fibers similar to those found in the rug behind the bar where the alleged struggle took place. In addition, the State presented as evidence shards of glass taken from appellant's shoes following his arrest that matched the type of glass found in one of the broken bottles behind the bar.

2. In McCracken v. State, 482 P.2d 269 (Alaska 1971), we held that the Alaska Criminal Rules afforded appellant the right to file an appeal in this case despite the failure of his counsel to file a timely notice of appeal. Final disposition of this appeal has been delayed by a change in counsel, an evidentiary hearing in the lower court, and the communica-tion lags caused in part by appellant's incarceration outside the State of Alaska.

3. U.S.Const. amend. VI provides in part: In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense.

U.S.Const. amend. XIV provides in part: [N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .

Alaska Const. art. 1, § 7 provides in part: No person shall be deprived of life, liberty, or property, without due process of law.

Alaska Const. art. 1, § 11 provides in part: In all criminal prosecutions, the accused shall have the right . . . to have the assistance of counsel for his defense.

4. 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

5. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

In *Wade,* the Supreme Court of the United States was confronted with a situation where, prior to the courtroom identification of defendant, the accused had been exhibited, without notice to or presence of counsel, to witnesses in a post-indictment lineup for identification purposes. The Supreme Court concluded that a post-indictment lineup [6] was a "critical stage" of the prosecution at which the accused was entitled to the aid of counsel.

The *Wade* court discussed in considerable detail the vagaries of eye-witness identifications.[7] Since a "confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially derogate from a fair trial", the court concluded that conducting such a confrontation without notice to and in the absence of an accused's counsel was a denial of the Sixth Amendment right to counsel, and called into question the admissibility at trial of the in-court identifica-

tions of the accused by witnesses who attended the lineup.[8]

In Stovall v. Denno, Justice Brennan acknowledged a second ground of attack on post-indictment identifications—a ground independent of any right to counsel claim. A confrontation between an accused and witnesses might be so unnecessarily suggestive and conducive to irreparable mistaken identification, said Justice Brennan, that the accused is thereby denied due process of law. The application of this due process test is not as automatic as the denial of right to counsel test presented in *Wade.* A violation of the due process of law guarantee in the conduct of a confrontation "depends on the totality of the circumstances surrounding it . . . ."[9]

■ In the case at bar, the issue of an improper post-indictment identification was not raised in the trial court. The issue appears for the first time in McCracken's points on appeal.[10]

The record reveals the following facts with regard to the allegedly improper

---

**6.** In *Wade,* the term "lineup" was given a broad definition. The court noted that a pretrial confrontation for the purpose of identification may take the form of either an identification parade or presentation of the suspect alone to the witness. The court concluded that "risks of suggestion attend either form of confrontation." 388 U.S. at 229, 87 S.Ct. at 1933, 18 L.Ed.2d at 1159.

**7.** 388 U.S. at 228–230, 87 S.Ct. at 1933–1934, 18 L.Ed.2d at 1158–1159.

**8.** *Accord,* Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

**9.** Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967). *Accord,* Rudd v. State of Florida, 477 F.2d 805 (5th Cir. 1973); Robinson v. State of Alabama, 469 F.2d 690 (5th Cir. 1972); United States v. Gilmore, 398 F.2d 679 (7th Cir. 1968).

**10.** Despite the failure of McCracken's counsel to raise this issue at trial, we find that the issue has not been waived. Waiver implies the intentional relinquishment of a known right or privilege. In the case at bar, McCracken's trial counsel was appointed by the court the same day as the parole hearing at

which the alleged unconstitutional identification took place. Thus, the first contact between client and attorney necessarily took place after the confrontation at the hearing had occurred. The record is devoid of any indication that defense counsel knew of either the parole hearing or of any identification of McCracken by the victims. Defense counsel specifically inquired at trial whether the police had conducted a lineup involving the accused, and was told that the police had not.

In the particular circumstances of this case, the only way trial counsel could have been aware of the allegedly unconstitutional lineup, which may have been a basis for a challenge of the in-court identifications by the victims, would have been through information supplied by McCracken. Given a silent record, we decline to make the presumption either that McCracken appreciated the constitutional significance of the alleged identification at the parole hearing, or that he accurately communicated the details of the hearing to his trial counsel.

Nothing we have said here should be read to indicate an abandonment of our previous position in Johnson v. State, 486 P.2d 379 (Alaska 1971), where we found a waiver of the right to object to a pretrial identification.

post-indictment identification. At the time of his arrest on the morning of February 12, 1969, for the shootings at the Polar Bar, McCracken was on parole from a previous criminal conviction for assault with intent to kill. A parole warrant was issued on February 12, and a hearing for parole revocation was set for February 14. McCracken appeared at this hearing with counsel, and at counsel's request the Parole Board promised McCracken a bill of particulars on the specific charges of parole violation. The Board then granted a continuance to enable McCracken and his counsel to adequately prepare for the hearing.[11]

On February 24, 1969, the grand jury returned an indictment against McCracken in connection with the incident at the Polar Bar on the morning of February 12.

On February 25, the Parole Board published the requested bill of particulars, and issued a notice addressed to McCracken and his attorney that a parole revocation hearing would be held the following day.[12] The purpose of this second hearing was for the hearing officer to make a temporary decision as to whether there was reasonable ground to believe that McCracken had violated his parole, pending a final decision by the full Parole Board.

On February 26, the second parole revocation hearing was held, and it was at this hearing that the improper post-indictment identification is alleged to have taken place.[13]

■ The record available to us is sparse as to exactly what transpired at this parole revocation hearing on February 26. McCracken asserts that he was transported from the jail to the McKay Building on February 26. Richard Lauber, Chairman of the Parole Board, then conducted an evidentiary hearing to decide if there was reasonable ground to conclude that McCracken had violated his parole conditions. McCracken alleges that he was without counsel despite a request for representation, dressed in jail clothes, and handcuffed during the course of this hearing. McCracken further states that the two alleged victims of the shooting were led into the hearing room and asked if McCracken was their assailant. It was these two victims who subsequently made in-court identifications at trial of McCracken as their assailant.

The record reflects conditions that augur the strong possibility that not only was McCracken's right to counsel at a "critical stage" of his trial violated, but also that the limitations set by due process requirements were exceeded here.[14] Our normal

---

11. A transcript of this Parole Board meeting is contained in the record on appeal.

12. The notice of hearing was addressed to McCracken and Peter Kalamarides, the attorney who had represented McCracken at the first parole hearing on February 14. On February 26 the superior court appointed Seaborn Buckalew to be McCracken's trial counsel. There is no indication in the record of any attempt to serve or communicate the notice of hearing to either attorney.

13. McCracken brought to the attention of this court the fact that an electronic recording had been made of this second hearing, and he petitioned for the inclusion of this tape in the record on appeal. In response to this request we remanded the case to the superior court for an evidentiary hearing as to existence and whereabouts of this tape. From depositions taken in connection with this hearing, the superior court found that a tape

had been made of the February 26 parole hearing, but that the whereabouts of the tape were unknown.

One of the explanations offered by the Parole Administrator for the disappearance of this tape was that the recording was of such poor quality that it could not be transcribed after the hearing, and it was subsequently destroyed.

14. The record furnished us contains the depositions of Richard Lauber and William Cunningham, Parole Board members who had been present at the February 26 hearing, taken in connection with the evidentiary hearing on the whereabouts of the missing tape. Both depositions lend general support to the allegations of McCracken that on February 26 he was identified by the alleged victims of the shooting without the presence of counsel and in circumstances that conveyed "suggestiveness."

procedure in such a situation would be to remand the case to the lower court for a hearing and findings of fact as to the existence of, and circumstances surrounding, any post-indictment identification of Mc-Cracken by the two victims on February 26.[15] Such a course of action, however, is unwarranted in the case at bar. Even assuming that there was a post-indictment identification conducted without the presence of counsel for the accused and in violation of due process of law, we find that such an unconstitutional confrontation would, in the particular circumstances of this case, mandate neither the exclusion of any testimony admitted into evidence by the trial court nor the reversal of Mc-Cracken's convictions. We hold that the courtroom identifications by the two victims in the present case derived from a source independent of the allegedly tainted parole revocation confrontation.[16]

We find it of significance that the case at bar does not involve any in-court testimony concerning the allegedly unconstitutional confrontation at the parole revocation hearing.[17] The two victims, who were allegedly present at the hearing and who later testified in court, simply identified McCracken at trial as their assailant, making no mention of any prior identification.

■ The Supreme Court in *Wade* devised the following inquiry to judge the legitimacy of such in-court identifications:[18] did the in-court identification have a source independent from the tainted confrontation, or was the introduction of the in-court identification testimony, in any event, harmless.[19] If the record reveals an independent source for the in-court identification of the accused by the victims, then there is no sound basis for excluding those identifications.[20] Alternatively, if there were conclusive independent evidence,

---

The state has argued that since any post-indictment identification which may have taken place in this case was staged by the Parole Board rather than the police, any defect in the procedure utilized would not be a ground for reversal of a conviction. If this argument is an attempt to distinguish between post-indictment confrontations staged by the Parole Board and those conducted by the police, we reject it. In either situation the accused has been exposed to a "grave potential for prejudice" by an official arm of the State.

15. As we noted earlier, the possible existence of an unconstitutional post-indictment identification by the victims who identified Mc-Cracken at trial was never mentioned in the lower court, and so that court had no opportunity to inquire into the facts surrounding such a confrontation. The superior court was the appropriate body in the case at bar to enter the initial findings of fact concerning the alleged confrontation. The record available to this court on appeal is simply too sparse with regard to what transpired at the February 26 parole revocation hearing to enable us to reach definite conclusions as to the scope and possible unconstitutionality of the confrontation. *See generally*, Williams v. United States, 136 U.S.App.D.C. 158, 419 F.2d 740 (1969); Smith v. United States, 134 U.S.App.D.C. 92, 413 F.2d 366 (1968), cert. denied, 395 U.S. 925, 89 S.Ct. 1780, 23 L.Ed.2d 242 (1969); Wright v. United States, 131 U.S.App.D.C. 279, 404 F.2d 1256 (1968).

16. *See* Davis v. State, 499 P.2d 1025 (Alaska 1972).

17. Such testimony is subject to a *per se* exclusionary rule. Gilbert v. California, 388 U.S. 263, 273, 87 S.Ct. 1951, 1957, 18 L.Ed. 2d 1178, 1186–1187 (1967).

18. The test for the legitimacy of the in-court identification is the same for violations of the right to counsel as it is for violations of the due process of law guarantee. *See* Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1237 (1968); Wright v. United States, 131 U.S.App.D.C. 279, 404 F.2d 1256 (1968).

19. The test has its basis in Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963), quoting from Maguire, Evidence of Guilt 221 (1959):
 [W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

20. In *Wade*, the court outlined various factors for consideration in determining whether the in-court identifications had a source independent of the tainted lineup, and included, *inter alia*, how long or well the witness observed the perpetrator at the scene of the crime and how well the witness knew the suspect. 388 U.S. at 241 n. 33, 87 S.Ct. at 1940, 18 L.Ed.2d at 1165.

apart from the identification testimony of the witnesses who attended the February 26 confrontation, that identified McCracken as the assailant, then the introduction of the in-court identifications would be harmless, even if improper.[21]

In United States v. Johnson,[22] the court was faced with the question of whether an extrajudicial photographic identification violated an accused's right to due process, and whether such a violation, if found to exist, necessitated the exclusion of the in-court identification of Johnson. The court held:

> Although in a proper case we would remand for a hearing to develop the totality of the circumstances, . . . here we think such a step is unnecessary. Even assuming a violation of due process, we are satisfied that the record shows by clear and convincing evidence that agent Cooper's in-court identification was "based upon observations of the suspect other than the [photographic] identification."[23] (citations omitted)

The "clear and convincing evidence" mentioned by the circuit court included the following: the witness had an opportunity to observe the heroin seller for approximately five minutes; although the immediate area of the transaction was not directly lighted, there was a light coming through an adjoining door; and finally, the witness was not under the extraordinary pressures created by a violent crime that sometimes distort observations. The court concluded that this was not a case where "a witness

catches only a fleeting glimpse of a criminal, and is then presented with a photograph that takes on an independent significance of its own."[24]

In United States v. Holiday,[25] two government witnesses made in-court identifications of Holiday after viewing him at an unconstitutional lineup.[26] Following the mandate of *Wade*, the court said:

> [A]n in-court identification during the trial by a witness who viewed the accused at the flawed lineup must be shown, by clear and convincing evidence, to have a source independent of the lineup—stemming from a high-caliber opportunity to view the accused at the time of the crime.[27]

The record in *Holiday* indicated that the two witnesses stood across a counter from the armed robber for 15 to 25 minutes, that the store in which the robbery took place was well lighted, and that the robbery took place in the daytime. Additionally, the accused was a distant cousin of one of the witnesses, known by that witness for five years, and immediately recognized upon entering the store. From these facts the court concluded that "the identification of Holiday at trial by the two lineup witnesses was amply sustained by their observation of him during the robbery independently of whatever recollection they might have had from the tainted lineup."[28]

We think that, as in *Johnson* and *Holiday*, the record in the case at bar clearly and convincingly indicates that the in-court identifications of appellant by the two vic-

---

21. This branch of the test is derived from Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), wherein the court stated "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710–711. *Accord*, Mead v. State, 504 P.2d 855, 858 (Alaska 1972) ; Davis v. State, 499 P.2d 1025, 1033 (Alaska 1972).

22. 412 F.2d 753 (1st Cir. 1969).

23. *Id.* at 755.

24. *Id.* at 755.

25. 482 F.2d 729 (D.C.Cir.1973).

26. The record in *Holiday* was unclear as to whether the accused had in fact had substitute counsel at his lineup. The court concluded that, given the gravity of the constitutional safeguard involved, the accused was to be afforded the benefit of the doubt. Thus the court based its analysis on the *assumption* that accused was not aided by counsel at the lineup. 482 F.2d at 733.

27. 482 F.2d at 733–734.

28. *Id.* at 735.

tims were based upon observations independent of the allegedly unconstitutional lineup. The victims of the assault, Danny Patterson and Dione Akers, testified that at the time of the shooting the bar was "pretty well lighted." The lights in the Polar Bar had been adjusted to a higher intensity than usual because the bar was closed and clean-up was under way. Ms. Akers testified that she opened the back door of the bar and recognized McCracken as he entered. Both victims further testified that McCracken stood only a few feet away from each when he shot them, and each stated that they were able to get a good look at him. Danny Patterson stated under oath that after McCracken shot him, McCracken came behind the bar where he lay. There was a further struggle at close quarters between Patterson and McCracken, with Patterson finally disarming McCracken and fleeing the bar.

In addition to the opportunity to observe their assailant at close quarters outlined above, both victims testified that they had an acquaintance with appellant prior to this assault. Danny Patterson stated that he had seen McCracken twice prior to the night of the assault, and that on the evening of February 11 McCracken had been in the Polar Bar on three separate occasions. Dione Akers testified that she had seen McCracken several times in various Anchorage bars, and that he had been in the Polar Bar three times on the evening of February 11.

On the basis of this record we find that the in-court identifications of McCracken by the two witnesses had a source independent of any unconstitutional confrontation which may have taken place at the parole revocation hearing on February 26.[29]

McCracken next urges that the trial court erred in denying his motion to retain an expert witness, costs and expenses to be borne by the State of Alaska. In a supporting affidavit McCracken argued that a paraffin test had been performed on him after his arrest on the morning of February 12, the results of which were negative, "that is, the test did not indicate that the accused had recently discharged a firearm."

With no further explanation, McCracken urged that the assistance of an expert witness was crucial.

The State submitted written opposition to McCracken's motion, contending that no showing as to the availability of such an expert had been made, and, in any event, since the paraffin test had proven to be negative, there was no substantive issue on which expert testimony could assist McCracken at trial. The trial court decided:[30]

[T]he motion for an expert witness is denied since [the] court finds there's no showing that it would in any way contribute to the defense or be of any probative value in the trial of the case. This is, of course, without prejudice, if the defendant can show in a reasonable time prior to trial that it is pertinent but there's been no showing and the motion is now presentative.

Despite the trial court's invitation to make a further showing as to how an expert on paraffin tests would aid his defense, no further evidence or argument was submitted by McCracken. In spite of the foregoing, McCracken argues that the denial of his motion to retain an expert witness at State expense violated both his Sixth Amendment right to compulsory process,[31]

---

29. Since we have disposed of this issue on the ground of "independent source," it is unnecessary for us to pose the additional inquiry as to whether admission of the in-court identifications by the two witnesses was harmless error, as defined by *Chapman*.

30. The lower court was forced to decide the issue on the basis of the terse memoranda submitted by both counsel because neither attorney appeared in court for a hearing scheduled on this matter.

31. U.S.Const. amend. VI and Alaska Const. art. 1, § 11 contain similar provisions guaranteeing a defendant the right to have compulsory process for obtaining witnesses in his favor.

and his right to the effective assistance of counsel.[32]

At the time McCracken submitted his motion to retain an expert witness at State expense, Alaska Criminal Rule 17(b) provided:

> The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense . . . .

> The cost incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees are paid in case of a witness subpoenaed in behalf of the state.[33]

■ The wording of our former Rule 17(b) is substantially the same as that found in the Federal Rules of Criminal Procedure. Professor Wright describes Rule 17 as the implementation of the accused's Sixth Amendment right to have compulsory process for obtaining witnesses in his favor.[34] Professor Moore characterizes Federal Rule 17(b) as "an attempt to eliminate some of the disadvantages to an accused who is financially unable to meet the costs and fees of subpoenaing witnesses necessary for his defense."[35] The right to subpoena by an indigent defendant encompassed in Rule 17(b) extends to expert as well as non-expert witnesses.[36] Under the federal rule the trial court has the discretion to deny an application for a subpoena where there is an insufficient showing of need.[37]

■ We hold that under Alaska's former Criminal Rule 17(b), as under the similar federal rule, the right to have a witness subpoenaed at state expense is not absolute. The trial court is vested with discretion in administering former Criminal Rule 17(b) in order to prevent abuses.[38]

■ Consideration of the record has led us to the conclusion that the superior court did not abuse its discretion in denying McCracken's motion to retain an expert witness. The discretion allowed a trial

---

32. The right to effective assistance of counsel claim is discussed *infra.*

33. Alaska Crim.R. 17(b) has been amended to now read in pertinent part:
 A subpoena shall be issued . . . for a defendant financially unable to pay the fees of the witness . . . . The cost incurred by the process and the fees of the witness so subpoenaed shall be paid by the Alaska Public Defender Agency.
 AS 18.85.100(a) provides in part:
 An indigent person who . . . is under formal charge of having committed . . . a serious crime . . . is entitled
 (1) to be represented by an attorney to the same extent as a person having his own attorney is entitled; and
 (2) to be provided with the necessary services and facilities of this representation, including investigation and other preparation.
 Neither of these provisions was in force at the time that McCracken presented his motion to retain an expert witness in the lower court.

34. 1 C. Wright, Federal Practice and Procedure § 271 (1969).

35. 8 J. Moore, Federal Practice ¶ 17.05 (2d ed. 1973).

36. *See* 1 C. Wright, Federal Practice and Procedure § 272 (1969). The Criminal Justice Act of 1964, 18 U.S.C. § 3006A(e), provides in detail for the obtaining of investigative, expert, and other services necessary to an adequate defense; consequently, the current federal cases focus on this federal act when the issue of the appointment of an expert witness for an indigent defendant is involved. *See, e. g.,* United States v. Bass, 477 F.2d 723 (9th Cir. 1973); United States v. Schultz, 431 F.2d 907 (8th Cir. 1970).

37. *See* United States v. Lepiscopo, 458 F.2d 977 (10th Cir. 1972); United States v. Schultz, 431 F.2d 907 (8th Cir. 1970); United States v. Conder, 423 F.2d 904 (6th Cir.), cert. denied, 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 267 (1970); Terlikowski v. United States, 379 F.2d 501 (8th Cir.), cert. denied, 389 U.S. 1008, 88 S.Ct. 569, 19 L.Ed.2d 604 (1967); 8 J. Moore, Federal Practice ¶ 17.05 (2d ed. 1973).

38. Compare Smiloff v. State, 439 P.2d 772, 775 (Alaska 1968), wherein we held, with regard to the wording of Crim.R. 17(b) which preceded the wording pertinent in the present case, that "the trial court is vested with discretion in order to prevent abuses."

court under our former Criminal Rule 17(b) was to be employed only to prevent abuse of process, not to place a heavy burden of demonstrating the need for the testimony of the witness on the defendant. In the case at bar McCracken's counsel made no attempt to explain either the nature of the paraffin test or the need for an expert witness on such a test to the trial court. In denying without prejudice the motion to retain an expert witness, the trial court indicated it would grant such a motion if McCracken could show how the expenditures could in "any way contribute to the defense or be of any probative value in the trial of the case." Review of the record discloses that McCracken did not attempt to make such a showing. Moreover, McCracken alleges for the first time on appeal that the testimony of an expert witness on paraffin tests could have established a reasonable doubt in the jury's mind whether McCracken had fired a gun within the three days prior to his arrest. However, in this appeal McCracken has made no showing as to what testimony the expert witness could have furnished in order to counter the indication that the time interval and washing of the hands negated the effect of the paraffin test. The specific circumstances in the case at bar reveal that expert testimony on the results of the paraffin test would have had only the slightest, if indeed any, evidentiary value. The record indicates that the paraffin test was administered only at the insistence of McCracken himself. *Prior to the adminis-*

tration of the paraffin test, McCracken had twice been fingerprinted by the police and had washed his hands after each fingerprinting. Testimony adduced at trial by defense counsel from State experts indicated that the paraffin test was one of limited usefulness, particularly when the individual being tested had washed his hands between the time of the alleged discharge of a firearm and the administration of the paraffin test.

McCracken next argues that his conviction should be reversed because he was deprived of the effective assistance of counsel.[39] McCracken's claim is actually two-fold: First that the trial court deprived him of the effective assistance of counsel by denying him the services of an expert witness at State expense; and secondly, that various errors made by appointed counsel rendered his assistance ineffective.[40]

■ The constitutional guarantee of assistance of counsel means that such assistance must be effective.[41] It would be a *difficult and delicate task for a reviewing* court to attempt to assess the effectiveness of individual tactical decisions made by trial counsel. In past decisions this court read "effective assistance" to describe a procedural requirement rather than a standard of skill.[42] In so doing we adopted a standard that unless the conduct of counsel is "so incompetent as to deprive his client of a trial in any real sense—render the trial a mockery and a farce . . ." then we will not reverse the conviction.[43]

---

39. *See* U.S.Const. amend. VI; Alaska Const. art. 1, § 11, quoted in note 4 *supra.*

40. Errors cited by McCracken include, *inter alia,* the following: (1) that counsel did not inquire whether the police had examined McCracken's overshoes which had been left in the bar where McCracken was arrested (such inquiry would have revealed an absence of any glass fragments in the overshoes which would in turn "prove" that the glass fragments in his shoes had been "planted" by the police); (2) that counsel failed to inquire whether any incriminating fibers had been found on McCracken's overcoat; (3) that trial counsel failed to bring out on cross-examination the animosity that the police officers involved

in the case held for McCracken; (4) that counsel failed to go into the fact that the owner of the gun identified as the assault weapon was a man who had a physical resemblance to McCracken; (5) that trial counsel advised McCracken to plead guilty, thus revealing his belief in McCracken's guilt and his necessary ineffectiveness. [Appt.Br. 30–32]

41. *See* Mead v. State, 445 P.2d 229 (Alaska 1968); Anderson v. State, 438 P.2d 228 (Alaska 1968).

42. *Anderson v. State,* 438 P.2d 228 (Alaska 1968).

43. *See, e. g.,* Sullivan v. State, 509 P.2d 832 (Alaska 1973); Tafoya v. State, 500 P.2d

Professor Finer has criticized the "farce" standard as both placing an unduly heavy burden on the defendant and being unduly vague and therefore difficult to apply. Professor Finer in turn suggests the following test to determine whether an accused has been accorded effective assistance of counsel:

[W]hether counsel exhibited the normal and customary degree of skill possessed by attorneys who are fairly skilled in the criminal law and who have a fair amount of experience at the criminal bar.[44]

This test finds some support in the case law. In Moore v. United States,[45] Judge Freedman, acting for the third circuit, articulated the test in the following manner:

Whether an indigent is represented by an individual or by an institution, he is entitled to legal services of the same level of competency as that generally afforded at the bar to fee-paying clients. In both cases, therefore, the standard of adequacy of legal services as in oth-er professions is the exercise of the customary skill and knowledge which normally prevails at the time and place.[46] (footnotes omitted)

■ We find that neither the denial of the services of a paraffin test expert at State expense nor the tactical choices criticized by McCracken deprived him of effective assistance of counsel under this court's standards or the standard espoused by the *Moore* court. We are satisfied from reading the record that the deprivation of a paraffin test expert did not render the assistance of trial counsel ineffective. The record indicates that the issue of the paraffin test administered to McCracken was an issue of extremely limited relevance. This is not a case where defense counsel was unable to effectively cross-examine an expert witness of the state on a pertinent issue because of a lack of available expertise,[47] nor is it a case where the defense was prejudiced by a total lack of testimony on a relevant issue.[48] The state did present expert witnesses who, at the

247 (Alaska 1972); Dimmick v. State, 473 P.2d 616, 618 (Alaska 1970). In Dimmick we said:

The right to the effective assistance of counsel requires only that counsel be conscientious and diligent in assisting a defendant in having a genuine trial in a reasonable sense—a trial where the government is put to its burden of proving guilt beyond a reasonable doubt, in accordance with established principles of law and fundamental notions of fair play and substantial justice. (footnote omitted)

*See also* AS 18.85.100(a)(1), (2).

44. J. Finer, Ineffective Assistance of Counsel, 58 Cornell L.Rev. 1077, 1080 (1973).

45. 432 F.2d 730, 736 (3rd Cir. 1970).

46. Judge Freedman explained the test in more detail as follows:

A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances. The artistry of the advocate is difficult to judge retrospectively because the ele-ments influencing judgment usually cannot be captured on the record. The kaleidoscopic range of possibilities often seems limitless, and it is proverbial that the finest ideas emerge on the way back from the courthouse. The advocate's work, therefore, is not readily capable of later audit like a bookkeeper's. Of course, not all the activity of the advocate has this highly subjective quality. It is possible to examine the sufficiency of his preparation and the adequacy of his knowledge of the relevant law. Review may disclose failures at the trial. All these are matters which will inform the judgment on a retrospective inquiry whether counsel adequately performed his duty. But since what is required is normal and not exceptional representation, there is room for the realization that it would be difficult to find a case where even the ablest and most experienced trial lawyer would be completely satisfied after a searching re-examination of his conduct of a case. 432 F.2d at 736–737.

*See also* Kott v. Green, 303 F.Supp. 821, 822 (N.D.Ohio 1968).

47. *See* Thessen v. State, 454 P.2d 341, 352–353 (Alaska 1969).

48. *See* Bush v. McCollum, 231 F.Supp. 560 (N.D.Ohio 1968).

In *Bush*, the defendant had previously been found to be insane, a finding that had never

probing of defense counsel, testified both as to the nature of a paraffin test in general and as to the relevance of the negative results when the test was administered to McCracken.

Likewise, the decisions of counsel at trial that are criticized by McCracken do not support a finding that McCracken was denied the effective assistance of counsel. Many of the criticisms are directed at tractical choices which must generally be left to the discretion of trial counsel if the adversary system is to retain its viability. It is particularly difficult for a reviewing court to assess the advantages that could have been gained by pursuit of a particular line of questioning at trial. Suffice it to say that the claimed errors of counsel listed by McCracken that pertain to decisions made at trial do not, in their aggregate, disclose a denial of effective assistance of counsel.

McCracken argues that the trial court erred in denying a motion, pursuant to AS 222.20.022, to disqualify the trial judge.

AS 22.20.022 provides in pertinent part:

(a) If a party or his attorney . . . files an affidavit alleging under oath that he believes that he cannot obtain a fair and impartial trial, the presiding . . . superior court judge . . . shall at once, and without requiring proof, assign the action to another judge of the appropriate court in that district, or if there is none, the chief justice of the supreme court shall assign a judge for the hearing or trial of the action.

. . . . . .

(c) The affidavit shall be filed within five days after the case is at issue upon a question of fact, or within five days after the issue is assigned to a judge, whichever event occurs later, unless good cause is shown for the failure to file it within that time.

In Channel Flying, Inc. v. Bernhardt [49] this court said with reference to the statute in question:

The only meaning that can be given to the requirement that the matter be assigned "at once and without requiring proof" to another judge, is that when a timely and proper affidavit is filed the, judge concerned is at once disqualified from acting as a judge in the particular action or proceeding . . . . If this were not the intent and effect of the statute, then it would be meaningless and ineffective. (451 P.2d at 574.)

■ Thus, if the motion for peremptory disqualification was timely filed, then the trial judge erred in not automatically excluding himself from sitting on the case. McCracken concedes, however, that the submitted motion was not timely.[50] McCracken's contention is that the court erred in not finding that there was "good cause" for failure to file the motion within the time limit stipulated in subsection (c).

In Pope v. State,[51] this court explained the rationale of the five-day limit in the following terms:

[T]he granting of the five-day period is to allow a party or his attorney an op-

---

been set side; yet when he was arrested on a felony charge and defense counsel raised the insanity issue, the trial court denied a motion for the appointment of a psychiatrist to diagnose the defendant mental condition. Testimony on the insanity issue at trial was given only by lay witnesses and a doctor with no special training in mental illness. The court found that:

In order for Bush in the instant case to have *the effective aid of counsel*, it was necessary for his counsel to have the assistance of a qualified psychiatrist and a trial, without expert evidence as to sanity, which found him sane and resulted in a life sentence is

so lacking in fairness as to be a denial of liberty without due process of law, contrary to the Fourteenth Amendment. 231 F.Supp. at 565. (emphasis added)

49. 451 P.2d 570 (Alaska 1969).

50. The case was assigned to Judge Moody, the trial judge, on March 5, 1969, with trial being tentatively set for March 24, 1969. Appellant's motion for peremptory disqualification of Judge Moody was submitted on March 19, 1969.

51. 478 P.2d 801 (Alaska 1970).

portunity to investigate the judge to whom the case is assigned and if necessary file the requisite affidavit for disqualification, thus avoiding the waste of judicial time which would result if an affidavit or disqualification were not filed until the date of trial because this would mean that the case would have to be continued until another judge could be assigned and the disqualified judge would not be ready at that time to start the trial of another action. (478 P.2d at 804.)[52]

Subsection (c) of AS 22.20.022 gives the court discretion to grant a peremptory disqualification motion that is not timely filed if the court finds that good cause has been offered for the failure to timely file. In the case at bar, McCracken stated in his affidavit to the lower court that his peremptory disqualification motion had not been filed within the requisite five days of the assignment of the case to the trial judge because of a "breakdown in dialogue" between himself and his appointed counsel.[53]

 We find that the trial court did not abuse its discretion in the determination that McCracken had failed to comply with the requirements of AS 22.20.022. It was within the bounds of allowable discretion to find that an allegation of breakdown in attorney-client dialogue did not satisfy the good cause requirement of AS 22.20.022. If we were to conclude otherwise, the inevitable result would be the removal of virtually all discretion on this matter from the trial courts and the total

erosion of the statute's five-day time limitation.[54]

McCracken's final specification of error is that the sentence imposed by the trial court violated the provision against double jeopardy found in the Alaska and United States Constitutions.[55]

 McCracken was convicted and sentenced on four separate counts: two counts (one for each victim) of shooting with intent to kill (a violation of AS 11.-15.150), and two counts of use of a firearm during an assault (a violation of AS 11.15.295). The lower court imposed a twenty-year sentence for each count of shooting with intent to kill, ordering the sentences to run consecutively. In addition, the court imposed a ten-year sentence for each count of use of a firearm during an assault, ordering each of these sentences to run concurrently with each twenty-year sentence.

In Whitton v. State,[56] this court held that Alaska's constitutional prohibition against double jeopardy prevented one from receiving multiple prison sentences for the same offense. In determining what constituted the same offense for double jeopardy purposes, we abandoned the "same-evidence" test in favor of the following approach:

We now meet the problem in another way, with confidence that it can be solved, by focusing upon the quality of the differences, if any exist, between the separate statutory offenses, as such differences relate to the basic interests

---

52. Roberts v. State, 458 P.2d 340, 346 (Alaska 1969).

53. In his appellate brief, McCracken recharacterizes this "breakdown in dialogue" as the "gross dereliction and ineffectiveness of appointed counsel." The failure of an attorney to file a peremptory challenge, pursuant to AS 22.20.022, within the 5-day time limit certainly does not, standing by itself, constitute "gross dereliction."

54. Of course, appellant was not foreclosed in the case at bar from filing a motion pursuant to AS 22.20.020 (Disqualification of judi-

cial officer for cause). No such motion was ever filed, nor has appellant presented any specific reason for the disqualification of the trial judge.

55. U.S.Const. amend. V provides in part:
 [N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . .
 Alaska Const. art. 1, § 9 provides in part that:
 [N]o person shall be put in jeopardy twice for the same offence.

56. 479 P.2d 302 (Alaska 1970).

sought to be vindicated or protected by the statutes.

The trial judge first would compare the different statutes in question, as they apply to the facts of the case, to determine whether there were involved differences in intent or conduct. He would then judge any such differences he found in light of the basic interests of society to be vindicated or protected, and decide whether those differences were substantial or significant enough to warrant multiple punishments . . . .

. . . [I]f there are no such differences, or if they are insignificant or insubstantial, then only one sentence may be imposed under double jeopardy. (479 P.2d at 312.)

Applying the test of *Whitton* to the case at bar, the State concedes in its brief that the multiple sentences imposed by the lower court violated this State's prohibition against double jeopardy. We are in agreement with the State's conclusion. Shooting with intent to kill is a more serious crime than use of a firearm during an assault because of the specific intent element present in the former. But the intent and conduct involved in the former clearly encompass the intent and conduct involved in the latter. The differences between the two crimes are insubstantial when judged in light of any social interest involved.

Thus, the imposition of sentence in the case at bar violated the prohibition against double jeopardy in the Alaska Constitution.[57] The fact that the sentences for use of a firearm during an assault were to run concurrently with the sentences for shooting with intent to kill does not render the error of the sentencing court harmless. Collateral disadvantages follow the receipt of concurrent sentences, and

such disadvantages are an improper burden on McCracken.[58]

Affirmed and remanded for modification of sentence in conformity with this opinion.[59]

ERWIN and FITZGERALD, JJ., not participating.

---

57. In Robinson v. State, 484 P.2d 686, 688 (Alaska 1971), we limited the impact of the *Whitton* decision to those cases pending on direct review in this court and to succeeding cases. Although McCracken's trial and sentence imposition preceded the *Whitton* decision, the delays in the filing of McCracken's notice of appeal, *see* note 3 *supra*, resulted in

the case at bar being appealed to this court after the publishing of *Whitton*.

58. *See* Whitton v. State, 479 P.2d 302, 314 (Alaska 1970) ; Gray v. State, 463 P.2d 897, 911 (Alaska 1970).

59. The consecutive 20-year sentences for shooting with intent to kill are affirmed.