**Peter Richard TROUNCE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1476.**

Supreme Court of Alaska.

June 12, 1972.

Herbert D. Soll, Public Defender, Bruce A. Bookman and Lawrence J. Kulik, Asst. Public Defenders, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Monroe N. Clayton, Dist. Atty., Lyle L. Carlson and James Hackett, Asst. Dist. Attys., Fairbanks, for appellee.

Before BONEY, C. J., and RABINOWITZ, CONNOR, ERWIN, and BOOCHEVER, JJ.

## OPINION

RABINOWITZ, Justice.

Appellant Peter Trounce, together with five codefendants, was indicted for the separate offenses of assault with a dangerous weapon and malicious destruction of personal property. After trial by jury,

Trounce was found guilty of assault with a dangerous weapon but was acquitted of the malicious destruction of personal property count. Trounce was thereafter sentenced to two years' imprisonment with one and one-half years suspended. Trounce now appeals from this conviction.

In this appeal Trounce urges two specifications of error. First, Trounce contends that the trial court should have granted his motion for judgment of acquittal as to the assault with a dangerous weapon charge. Secondly, Trounce argues that the trial court committed reversible error when it failed to grant his motion to dismiss the assault with a dangerous weapon count because of its duplicity.[1]

The indictment in the case at bar in part charged Trounce with the crime of assault with a dangerous weapon in the following manner:

That on or about the 4th day of July, 1970, at or near Fairbanks, in the Fourth Judicial District, State of Alaska, . . . Peter Richard Trounce [and others] . . . being then and there armed with dangerous weapons, to-wit: lengths of chain, did wilfully, unlawfully and feloniously assault Edward Patrick Leonard and Terry Don Lee, by striking them about the face, head and back with said lengths of chain.

The incidents that led to Trounce's conviction were horrifying and reflective of some of the most lawless attributes of man. This tale of violence begins in the early morning hours of July 4, 1970, by the shores of Harding Lake, a popular recreation area located approximately 49 miles south of Fairbanks. Shortly after midnight, several of the occupants of two cars, a Ford Falcon station wagon and gunmetal gray sedan, got into a fight at Pearl's Landing.[2] It

seems that the fight started when the operator of the sedan took a shoe belonging to the operator of the station wagon and threw it into the lake. Several vacationers, some soldiers from Ft. Wainwright and some civilians, who happened to be in the vicinity of Pearl's Landing, witnessed the scuffle, intervened, and broke it up. After the fight was stopped, the original combatants and their friends got into their respective cars and drove off. As they departed, the occupants of the sedan informed the civilians and the soldiers who had intervened in the fight that they would be back and would get even with them.

At approximately 3:30 the same morning, Russell Gillaspie, one of the civilians who helped break up the earlier fight was sitting in his camper, with his wife and some visitors. At that time he "heard a screeching of tires and a couple of cars pulled" into the landing. Gillaspie recalled that one of the vehicles was of the same color as the sedan that had been seen at the landing earlier that same morning; the other vehicle was an old blue pickup. This witness saw six people get out of the two cars with chains and clubs in their hands and stated that they were "swinging [the chains] around the air and beating the ground and hollering and ranting and raving out there." Gillaspie next observed that the chain wielders were beating on the latrine where Sergeant John Daly, one of Gillaspie's guests, had gone just a few minutes prior to the arrival of the two vehicles.

Edward Leonard, a serviceman who had been present at the earlier fight, was at this time in the area of the latrine building. Leonard saw the pickup and sedan drive up. He identified the car as the one that had been there earlier and stated that some of the people who drove up at this time were involved in the earlier fight. According to

1. In his brief Trounce further specified that it was reversible error on the trial court's part to have refused his requested instruction which pertained to the essential elements of the crime of assault with a dangerous weapon as charged in the indictment. At oral argument counsel

for Trounce abandoned this specification of error.

2. Pearl's Landing consisted of a strip of shoreline 50 feet wide, a boat ramp for loading and unloading boats, two rest rooms, and a small store building. Parking space for vehicles was also available.

Leonard, they all jumped out of the car, looking like "they were going to beat us up." He noted that the occupants of both vehicles were taking chains out of the rear of the pickup. At this point, Leonard testified, "All these men that were in the car, and the pickup moved towards me at one time all together." and "[t]hey were around me; I was completely encircled" by seven chain carrying assailants. As the group came closer, Leonard was struck by a chain. Leonard then ran off into the woods pursued by an assailant armed with a chain. During his flight, Leonard fortuitously found a length of pipe, picked it up, and with it persuaded his pursuer to break off the chase.

When the two vehicles drove up, Terry Lee, another serviceman, moved to be near Edward Leonard. Lee saw seven or eight people get out of the vehicles and observed that some had chains and one individual had a rifle or shotgun. According to Lee, three or four members of the group "came around" Leonard and himself. Lee said that Leonard was then told to take off. Lee next remembers being hit four or five times by chains. Sergeant Daly was in the latrine at the time the two vehicles arrived. The next thing he heard was screaming and yelling for him to come out; he was told he was going to get his. When he came out, he saw a bunch of youths standing not far away holding five or six chains, two or three clubs, and a shotgun. According to Daly, the group at this point in time was talking about how they were going to get even with the soldiers. Daly then made a successful dash for the Gillaspie camper.

The state's evidence showed that all of the assailants were young with the exception of an older man who appeared to be the one who was "directing or commanding these young people what to do," and "giving orders . . . telling to go down and get this one, do this, do that." [3]

After the two servicemen had been chained, some of the group directed their attention towards Gillaspie's camper, chaining the camper and smashing a window. According to Sergeant Daly, the persons that were outside the camper threatened they were going to get even with the soldiers. The harassment of the occupants of the camper lasted for approximately ten minutes, and then the entire group left together, using the two vehicles. Just prior to the departure of the two vehicles, John Somaduroff, a young high school student, and two friends were walking down a road which led to the boat landing. Somaduroff described the scene he came upon in the following manner:

What I saw was, there was one guy with his—he was kind of beat up, hanging on a pole. And there was another guy laying off to the side and there were several—several men running around. I think a couple of guys had chains and one guy had a gun. And he was yelling . . . 'Come out or I'm gonna shoot . . . through the camper.'

Somaduroff was the only prosecution witness who was able to identify Trounce as being at Pearl's Landing, although he could not remember Trounce's exact location or what Trounce was doing at the time.[4]

3. The only prosecution witness whose testimony differed was that of Terry Lee. This witness was asked if it appeared that the old man was giving instructions. Lee answered, "No. Just doing a lot of yelling. . . ."

4. Many of the prosecution witnesses had difficulty identifying the defendants. Edward Leonard, one of the two servicemen who was chained, testified that because of the time lapse he could not identify any of the individuals involved. Terry Lee, the other victim, said that the as-

sailants had much longer hair than that of the defendants present in the courtroom, and that two of the assailants had beards at the time. Two other state witnesses, Mrs. Bonnie Daly and Melvin Wilson, admitted difficulty in making an in-court identification of any of the defendants. They asserted that their difficulties stemmed from the fact that the individuals they saw during the Pearl's Landing chainings had long hair and beards.

During the examinations of several state witnesses, the prosecutor showed

After the assailants left, Somaduroff's two friends, Bruce and Blake Gwalthney, chased the vehicles and were successful in getting their license numbers. Gillaspie called the state police office in Fairbanks, giving the dispatcher a description of the two vehicles and their license numbers. Later in the day Officer DeTemple of the Alaska State Troopers spotted the pickup truck just north of Tok, Alaska, some 250 miles south of Harding Lake.[5] Shortly thereafter, back in Tok, Officer DeTemple came upon the gunmetal sedan with four occupants in it. Trounce was identified as one of the occupants of the sedan.[6] DeTemple testified that he asked the four occupants of the sedan "why they looked so—well, they weren't—they didn't look beat up, but they looked like they'd gone a few rounds with somebody . . . . [and] one of them said that they had had a disagreement." No arrests were made at this time. Officer Morris Rogers of the Alaska State Troopers related that on the same day, July 4, he also had occasion to stop the sedan on the Richardson Highway. This witness said that at this time he observed Trounce, and that Trounce's forehead showed signs of a scuffle.

> I recall there was . . . a slight fresh looking scab over one of his eyes. It

did not appear serious so I did not take critical note of it, but I do recall that there was a slight injury to his—above one of his eyes.

Just before the prosecution rested its case, trial counsel for Trounce stipulated that

> in the case of the registration of the automobile that was stopped by Trooper Nickel, the district attorney and I have agreed to stipulate the registration into evidence plus the fact that the car is registered in the name of the father of the defendant Trounce.

■ We hold that the evidence detailed above supports the trial court's denial of Trounce's motion for judgment of acquittal. Alaska's Code of Criminal Procedure abrogates the distinction between accessories and principals: "[A]ll persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or, though not present, aid and abet in its commission, shall be prosecuted, tried, and punished as principals."[7] Here, Trounce was charged as a principal, although the theory of the prosecution's case was that he aided and abetted the assaults of Lee and Leonard. We note that the trial court properly instructed the jury on the prosecution's theory of aiding and abetting,

---

the pictures of the defendants that had been taken by the Alaska State Troopers on July 4. The pictures were of no assistance to any of the state's witnesses with the exception of John Somaduroff. The witness Somaduroff was shown the photographs of the defendants and stated that the picture of Trounce refreshed his recollection, and he was then able to make an in-court identification of Trounce. On cross-examination by Trounce's counsel, the witness admitted that the only difference between the photograph and Trounce's in-court appearance was that Trounce's hair was somewhat shorter and cleaner at present. On redirect, Somaduroff explained that he could not identify Trounce in the courtroom before being shown the photograph "[b]ecause I can't see too well from here . . . . I busted my glasses and these are just temporary." Counsel for Trounce stated that he had no objection to the admission of Trounce's

photograph into evidence, and later in the trial moved its admission.

5.  Officer DeTemple asked the two boys who were in the pickup for identification and ascertained that one was Harry John Ketzler and the other Robert Benefield. Other prosecution witnesses placed both Ketzler and Benefield at the landing during the time the chainings occurred.

6.  Officer DeTemple also identified Clifford Lewis Avey and John Braham as being occupants of the sedan that he had stopped at Tok.
    Several state witnesses placed Avey and Braham at the landing at the time the servicemen and Gillaspie broke up the first fight. Several prosecution witnesses also placed Avey and Braham at Pearl's Landing at the time the chainings took place.

7.  AS 12.15.010. *E.g.*, Ransom v. State, 460 P.2d 170, 172 (Alaska 1969).

as well as the requisite intent for conviction of the crime of aiding and abetting an assault with a dangerous weapon.

■ On appeal from a denial of a defense motion for judgment of acquittal, we view the evidence and the inferences to be drawn therefrom in a light most favorable to the prosecution. Beavers v. State, 492 P.2d 88, 97 (Alaska 1971). Analysis of the prosecution's case in this light has convinced us that fair-minded men in the exercise of reasonable judgment could have differed on the question of whether Trounce's guilt had been established beyond a reasonable doubt, and that therefore the motion for judgment of acquittal was properly denied. Bush v. State, 397 P.2d 616 (Alaska 1964). Here the jury had before it evidence that the gunmetal sedan, which was registered in Trounce's father's name, was at Pearl's Landing at the time the servicemen and Gillaspie broke up the first fight. The state also showed that before leaving, the three occupants of the Trounce sedan told the servicemen and Gillaspie that they would be back to get even with them. Later the same morning, the Trounce vehicle returned accompanied by a pickup truck. The occupants of both vehicles, numbering then at least six, got out of their respective vehicles, proceeded to the rear of the pickup truck, and armed themselves with chains.

After some preliminaries which involved hollering, beating the ground with the chains and whirling the chains in the air, the group encircled two servicemen, Leonard and Lee, striking them with their chains. Some of the group also pounded Gillaspie's camper with chains. There was evidence that all of the young assailants were acting under the direction of an older man. One state witness placed Trounce at the scene of the chainings shortly after they had taken place. All left Pearl's Landing at the same time. Later that day, Alaska State Troopers saw

Trounce in the gunmetal sedan on two separate occasions. Trounce "appeared to have gone a few rounds" and one Alaska State Trooper noticed that Trounce's forehead showed signs of a scuffle. All of the other occupants of the Trounce vehicle at the time it was stopped by the Alaska State Troopers were identified by other prosecution witnesses as having been at Pearl's Landing during the chainings. In our view, this evidence warranted denial of Trounce's motion for judgment of acquittal and adequately supports the jury's guilty verdict. The jury could have found beyond a reasonable doubt that Trounce was a member of a group that planned to seek revenge against the soldiers and civilians who had earlier stopped a fight that involved some members of the group. The jury could have further concluded that Trounce actively aided and abetted in the chainings of Leonard and Lee which were committed by the group.

■ Trounce also asserts that the trial court erred in denying his motion to dismiss the assault with a dangerous weapon count of the indictment on the ground that it was duplicitous. Criminal Rule 12(b) (2) provides, in pertinent part:

> Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. . . . Failure to present any such defense or objection constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver.[8]

Under the parallel Rule 12(b) (2) of the Federal Rules of Criminal Procedure, it has been held that an objection to the indictment on grounds of duplicity is waived unless this objection is raised prior to trial, e. g., Pino v. United States, 125 U.S. App.D.C. 225, 370 F.2d 247, 249 n. 1 (1966); Beauchamp v. United States, 154 F.2d 413

---

8. Crim.R. 12(b) (3) provides that "[t]he motion shall be made before the plea is entered, but the court may permit it to be made within a reasonable time thereafter."

(6th Cir. 1946), or, at the very least, unless the objection is raised prior to the verdict, *e. g.*, Mitchell v. United States, 434 F.2d 230 (9th Cir. 1970); United States v. Costner, 359 F.2d 969 (6th Cir. 1966). In the case at bar, the record shows that although the indictment was returned in July 1970, and that Trounce was represented by counsel at his arraignment in November 1970, his trial counsel first moved to dismiss the assault with a dangerous weapon count at the trial, which was commenced in January 1971, after the jury had been impanelled. For purposes of this appeal, we will consider the issue of the duplicitous character of the assault with the dangerous weapon count as having been timely raised.

■■ As a matter of proper procedure, a motion to dismiss is not the appropriate way to remedy duplicity. Criminal Rule 7(c) provides in part:

No indictment is insufficient, nor can the trial, judgment or other proceedings thereon be affected by reason of a defect or imperfection in matter of form in the indictment, which does not tend to prejudice the substantial rights of the defendant.

It is generally recognized that the rule against duplicity is a pleading rule rather than one that affects substance. Duplicity, therefore, is not necessarily a fatal defect.

Rather, charges improperly joined in a single count can be segregated into separate counts in the same indictment. *See* 1 C. Wright, Federal Practice and Procedure § 142 (1969). It would have been proper, then, for counsel to move to amend the indictment as suggested by Criminal Rule 7(e),[9] or, as suggested by Criminal Rule 14, to move to require the prosecutor to make an election.[10] *See* 1 C. Wright, Federal Practice and Procedure § 145 (1969).

■ Assuming the assault with a dangerous weapon count was duplicitous in that it alleged separate assaults upon Leonard and Lee, we must now determine whether this defect requires reversal of Trounce's conviction.[11] In Drahosh v. State, 442 P.2d 44, 48–49 (Alaska 1968),[12] this court said:

Normally, in the absence of a showing that a defendant's substantial rights were prejudiced thereby, an otherwise proper judgment of conviction will not be disturbed because of a duplicitous count in the indictment or complaint. (footnote omitted.)

Reversing the conviction in *Drahosh*, we emphasized that "there remains the possibility that there was no unanimity as to either, or both, of these separate offenses." 442 P.2d at 49. Unlike the *Drahosh* situation, here the jury was specifically instruct-

---

9. Crim.R. 7(e) provides:
   If any error in form shall exist in any indictment . . . or in the manner of describing the offense, . . . the court may permit the indictment or information to be amended at any time before verdict or finding if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced.

10. Crim.R. 14 provides in pertinent part:
   If it appears that a defendant or the state is prejudiced by a joinder of offenses . . . in an indictment . . . the court may order an election or separate trials of counts . . . or provide whatever other relief justice requires.

11. The rationale of the rule which bars duplicity has been explained as follows:
   It protects a defendant's right under the Sixth Amendment and Rule 7(c) to notice of the 'nature and cause of the accusation' against him so that he may prepare

his defense. It also insures that if defendant is convicted, the offense upon which he is convicted will clearly appear from the verdict, so that appropriate punishment may be imposed. Finally, duplicity is prohibited because confusion as to the basis of the verdict may subject defendant to double jeopardy in the event of a subsequent prosecution.
   8 J. Moore, Federal Practice ¶ 8.03[1] (2d ed. 1968) (footnotes omitted).

12. *Drahosh* involved two separate crimes, namely, failure to remain at the scene of an accident and failure to render assistance to an injured passenger. The two charges were joined in a single count in the complaint and were similarly joined in the form of verdict. There we held this to be violative of Crim.R. 8(a) which, while it allows two or more offenses to be charged in the same indictment, requires that each offense be charged in a separate count.

ed that before they could find Trounce guilty they must find that he aided and abetted in the chain assaults upon both Leonard and Lee. On the basis of our study of the entire record, and in particular the evidence which has been heretofore detailed, we cannot find that any of Trounce's substantial rights were prejudiced by the assumed duplicitous wording of the indictment.[13] For we fail to discern in the evidence any significant basis for the possibility that the jury's verdict of guilt as to the assault with a dangerous weapon count lacked unanimity as to either, or both, of these assaults. *Compare* Nickerson v. State, 492 P.2d 118 (Alaska 1971).

The judgment of conviction is affirmed.

13. After all parties had rested, counsel for Trounce renewed his motion to dismiss the assault count because of its duplicity. In denying the motion, the trial court said in part, after discussing when the motion should be made and the possibility of requiring an election by the prosecution in certain circumstances:

I have considered it in the theory of this case, . . . being fundamentally one of aiding and abetting, that it doesn't really change . . . the burden of either the state or the defendant or any of the defendants. . . . If you were to strike out . . . or get another count there . . . separating the two soldiers Leonard and Lee, . . . the whole theory of this case, as I see [it] is there was a group assault on these people out there and that is in essence the criminal act which is being prosecuted.

So . . . it reduces down to virtual insignificance just who they were or how many there were.