**Wesley LADD, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 2475.**

Supreme Court of Alaska.

Sept. 2, 1977.

**962**

Richard B. Collins, Collins, Inc., P. C., Anchorage, for appellant.

Ivan Lawner, Asst. Dist. Atty., and Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

CONNOR, Justice.

This is an appeal from a conviction upon a jury verdict for the crimes of kidnapping (AS 11.15.260)[1] and first degree murder (AS 11.15.010).[2]

On March 14, 1974, appellant Wesley Ladd was indicted for the kidnapping and first degree murder of John F. Rich.[3] Thereafter, Ladd filed a motion to suppress all statements made by him from the time of his arrest under an unrelated federal indictment on December 15, 1973, through February 2, 1974. At the suppression hearing Ladd expanded his motion to include all statements he made to the police prior to his indictment on March 14. The motion was denied. Ladd was subsequently tried in Kodiak, Alaska, and convicted by a jury on both charges in the indictment. Ladd was sentenced to concurrent life terms to be served consecutively to a federal sentence he was then serving.

Ladd raises six issues on appeal:

(1) Whether the trial court erred in denying the motions to suppress;

(2) Whether the trial court erred in failing to submit to the jury the issue of the voluntariness of his statements;

(3) Whether the trial court erred in permitting the prosecution to introduce testimony from an earlier trial in which Ladd was acquitted;

(4) Whether the trial court erred in denying Ladd's motion for acquittal on Count II of the indictment, the kidnapping charge;

---

1. AS 11.15.260 provides:
 "Kidnapping. A person who knowingly and without lawful reason kidnaps, abducts or carries away and holds for ransom, reward or other unlawful reason another person, except in the case of a minor by his parent, is punishable by imprisonment for a term of years or for life."

2. AS 11.15.010 provides:
 "First degree murder. A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall be sentenced to imprisonment for not less than 20 years to life."

3. John Rich, who was the owner of a massage parlor in which Ladd at one time had an interest, had testified against Ladd in a murder trial in 1973. After Ladd's acquittal in that trial, he returned to Cordova and resumed his occupation as a fisherman. He became romantically involved with Virginia Pinnick and made the acquaintance of Benny Ramey and Gary Zieger.
 In the summer of 1973, Ramey, Zieger and Pinnick returned to Anchorage and stayed with Pinnick's mother, Caye Mason, at Mason's home in Eagle River. There are two versions of the plot which resulted in the eventual demise of John Rich. According to Benny Ramey, who testified against Ladd in exchange for the dismissal of another criminal charge against him, the plan was to entice Rich out to Eagle River on the pretense that Ladd was interested in buying some guns from him, and to use force if Rich refused to cooperate. Rich could then be forced to sign a power of attorney in order to effectuate a transfer of the massage parlor to Ladd. Ladd, however, denied that there was any conversation about kidnapping Rich, and asserted that the plan was to effectuate a transfer of property to Gary Zieger. In any event, Rich was killed and his body disposed of. Benny Ramey then flew to Seattle under Rich's name to make it appear that Rich had left the state.

(5) Whether it was prejudicial error for the prosecutor to carry a concealed weapon on his person during the trial; and

(6) Whether the imposition of concurrent sentences for kidnapping and murder placed Ladd twice in jeopardy for the same offense.

I

Ladd argues that his statements were obtained in violation of his constitutional rights. He contends that he was not afforded his *Miranda* rights and that he was denied due process because his confessions were involuntary. The state asserts that Ladd waived his *Miranda* rights and that his confessions were voluntary.

Ladd's motion to suppress comprehended a total of eight statements made between December 15, 1973, and March 6, 1974. The statements to which the motion was primarily directed occurred on January 31 and February 1, 1974. After an extensive evidentiary hearing, Judge Kalamarides concluded that Ladd's statements were voluntary and that he had been afforded his *Miranda* rights. The motion to suppress was, therefore, denied. We will discuss the statements in chronological order.

*Introduction.*

On December 15, 1973, State Trooper Ronald Cole arrested Wesley Ladd in Cordova for violation of a federal firearms law. After the arrest at approximately 9:30 a. m., Ladd was taken to the Cordova Police Department located in the City Hall. Approximately five minutes after Ladd was arrested, Cole advised him of his rights to remain silent and to have counsel present. Cole then stated he wished to ask Ladd some questions about his contacts with John Rich and about a power of attorney that Rich had given Ladd. Ladd requested an attorney to represent him before answering any questions concerning Rich. Cole informed Ladd there were no attorneys in Cordova, but permitted him to call Larry Kulik in the Anchorage public defender's office. When Kulik returned his call, some twenty-five minutes later, he said he would

not be able to represent Ladd because of a conflict of interest.

Ladd then told Cole he was unable to obtain an attorney and did not want to make a statement until he had conversed with one. At his suppression hearing Ladd said that Cole continued to question him despite this request. Cole testified that he advised Ladd that he did not have to answer any questions, but that there were some which Cole wished to ask him. To this Ladd responded he would "take the questions as they came and determine whether or not he wanted to answer them." Cole proceeded to question Ladd, but did not obtain any incriminating statements from him.

1. December 16, 1973, statement.

Following his arrest on the federal charge Ladd and his girlfriend Virginia Pinnick, who was already in custody in connection with the Rich murder, were flown to Anchorage. Ladd was placed in the Anchorage jail. On December 16, Inspector Vaden of the Alaska State Troopers, who was investigating the Rich murder, visited Ladd. He did not advise Ladd of his *Miranda* rights because he "didn't particularly want to talk to him about the Rich matter" but rather about several other murders and about threats against Ladd's life. At this point, the record becomes confusing. At one point, Inspector Vaden testified that Ladd said he would be glad to give him a complete statement about Rich's disappearance as soon as an attorney was appointed to represent him. At another point Vaden and Ladd himself testified that Ladd volunteered to take a polygraph test and then gave Inspector Vaden a list of questions and the answers that he would give about his involvement in the Rich case.

On December 19, 1973, Ernest Rehbock was appointed to represent Ladd on the federal charge against him. Rehbock refused to discuss the Rich murder with Ladd, but he did advise Ladd to remain silent and to request advice of counsel before answering any questions. Ladd did not have an

attorney to represent him on the state charges at this point.

### 2. December 20, 1973, statement.

On December 20 Virginia Pinnick led the state troopers to the Sutton Mine area where Rich's body was buried. Late that evening Inspector Vaden went to the jail and told Ladd that the troopers had recovered Rich's body. He fully advised Ladd of his *Miranda* rights and obtained a written waiver of them. Ladd told Vaden that the attorney representing him on the federal charge, Mr. Rehbock, advised him not to speak to the police until he had counsel, but that he felt he should talk to Vaden anyway. Ladd admitted being involved in the Rich matter and then recounted one version of what had happened to Rich.

### 3. January 17, 1974, statement.

On January 17, Ladd was interviewed by Inspector Hoffbeck of the Alaska State Troopers. Hoffbeck advised Ladd of his constitutional rights and obtained a written waiver of them. Ladd then restated essentially what he had told Inspector Vaden.

### 4. January 31, and February 1, 1974, statements.

At this point it is necessary to discuss Ladd's confinement in the Anchorage jail from December 15, 1973, to January 31, 1974, because Ladd alleges he was coerced to confess. At the suppression hearing and at the trial Ladd introduced evidence on the circumstances of his imprisonment. He was confined in a small solitary cell in the maximum security unit of the Anchorage jail on December 15, 1973, apparently because of threats on his life.[4] He was not permitted to have visitors, appointments or phone calls unless the federal marshal specifically authorized them. He was permitted to see his fiancee but not during regular visiting hours.

At the suppression hearing in support of his claim that his confessions were coerced, Ladd introduced evidence of weight loss, nervousness,[5] insomnia and general agitation[6] resulting from his imprisonment. He also emphasized the importance of his relationship with his fiancee and the tranquilizing effect that visits with her produced. He contends that his confessions were a result of his concern for her well-being, Inspector Vaden's alleged promise not to prosecute her, and the stress produced by the deprivation of her company.[7]

In order to rebut Ladd's allegation of coercion, the state offered in evidence a letter Ladd wrote to one of the correctional officers thanking him for the fine treatment he was receiving and requesting additional visits with Pinnick. The state also endeavored to demonstrate that Ladd exaggerated his affections for Pinnick. Evidence was introduced to show that despite his proclamations of love, he was also dating her mother, Caye Mason, and that he

---

**4.** In *McKinney v. State*, 566 P.2d 653 (Alaska 1977), we questioned the conditions under which defendants are incarcerated in Alaska's prisons in light of the constitutional prohibition against cruel and unusual punishment. But, since as in that case, this issue has not been raised here, we will not consider it.

**5.** Ladd was given a mild daily dosage of valium for nervousness and insomnia. On January 14, vistaril, a muscle relaxant and tranquilizer was prescribed, and on January 31 this medication was continued. This evidence was introduced apparently to show that he was "in the process of becoming a nervous wreck" and therefore needed tranquilizers. Appellant's theory was not that the waiver of his *Miranda* rights was invalid because he was drugged, but rather that under the totality of circumstances the statements were coerced.

**6.** Dr. Hunt, a prison psychiatrist, testified at Ladd's suppression hearing that Ladd requested to be placed in a therapy group. Dr. Hunt stated that he had difficulty communicating with Ladd whose speech was garbled. This evidence was introduced in support of Ladd's theory that he was under extreme emotional stress. However, in an effort to rebut the testimony of Dr. Hunt concerning Ladd's strange behavior, the prosecution demonstrated that Ladd was slightly hard of hearing.

**7.** Inspector Vaden testified that Ladd told him on two occasions he was in love with Pinnick, and had pleaded with him not to file charges against her, but Inspector Vaden denied making any statement to the effect that Pinnick would not be prosecuted.

continued to volunteer information which implicated Pinnick deeply in the murder.

On January 30, 1974, Ladd was visited by two clergymen who testified that they found him visibly distraught, flushed in the face, intermittently crying, but basically coherent. Ladd asked them to send a message to Inspector Vaden telling him to come to the jail so he could warn him of a plot to poison his co-defendant Benny Ramey.

On January 31, Vaden came to the jail to visit Ladd. There is conflicting testimony concerning what happened during this visit. At the suppression hearing, Ladd testified that he discussed the plot to kill Ramey. He said that, given his state of mind, he was willing to talk to anyone about anything, and told Inspector Vaden that if he so desired, Ladd would make a statement. He testified that Inspector Vaden advised him of his *Miranda* rights, but then asked him to wait until the next day before making a statement.

At the trial Ladd changed his story. He testified that Vaden asked him whether he wanted to talk about the events surrounding Rich's disappearance. Ladd claimed that after he made several statements concerning the Rich murder, Inspector Vaden told him that he would be guilty as an accessory and showed him the relevant Alaska statutes. Ladd said he was also led to believe that Virginia Pinnick would not be prosecuted and that this was a prime consideration in his decision to agree to tape a statement concerning his involvement in the Rich murder.

According to Inspector Vaden, Ladd had told him he was bothered by Rich's death, he did not know if he had committed a crime and wanted to discuss the matter so the police could decide what, if any, crime he did commit. The only crime he could think of was involuntary manslaughter. Ladd told Inspector Vaden about the events leading up to the murder of John Rich, the details of the murder, and the subsequent events. According to Inspector Vaden, after Ladd talked about his involvement in the Rich murder, Ladd asked him about the penalty for being an accessory, because he thought he might be guilty of that crime. Vaden testified that at that point he showed Ladd the statute on accomplice liability.

At the end of the visit Inspector Vaden asked Ladd whether he would agree to having his statement taped so there would be no misunderstanding about the words Ladd used in the oral statement. Ladd showed some hesitancy, and Inspector Vaden asked him whether he would feel more at ease if Pinnick were present. Ladd indicated that he would like to have her present. Inspector Vaden replied that Ladd could probably visit with her while the statement was being transcribed by a secretary.

On February 1, 1974, Inspector Vaden drove Ladd from the jail to the police station. No one else was present in the car. Vaden testified that theoretically Ladd could have jumped from the car at any time since the only restraint on Ladd was Vaden's presence. At the police station, Ladd was permitted to walk up and down the hall. There were no visible security measures taken. Pinnick was present at this time, and was not separated from Ladd by a security screen. Before the taping began Ladd was advised of his rights and signed a written waiver of them. After the taping was completed, Ladd and Pinnick were allowed to be alone for a period of about forty-five minutes.

Ladd was given a polygraph test on February 2. The test showed that he was lying in response to every question, though Ladd said this happened because he was so nervous. There was no evidence to show that Ladd had been advised of his constitutional rights at the time the test was taken. On February 4, Ladd asked Inspector Vaden to contact him so he could correct the transcript made from the February 1 tape. Inspector Vaden went to the jail, and asked Ladd to sign the transcript. At first he refused to do so and asked that the transcript be destroyed. When Inspector Vaden said he could not do so, Ladd then went through the transcript and made corrections. On March 6, Inspector Vaden and Officer Rice of the Anchorage Police De-

partment visited Ladd. They did not advise Ladd of his constitutional rights, nor did they ask him any questions about the Rich homicide. Inspector Vaden testified that Ladd told them he planned to plead not guilty at the trial and he then again discussed his involvement in the Rich murder.

We note at the outset that although Ladd was initially arrested on an unrelated federal charge, under *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), he is protected by *Miranda* with respect to any questioning that might take place. The central question in this case is whether the state has met its heavy burden to show that, having invoked his rights to remain silent and to counsel, Ladd thereafter "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966) (citations omitted); *see also Michigan v. Tucker,* 417 U.S. 433, 444–45, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Tarnef v. State,* 512 P.2d 923 (Alaska 1973). We conclude that the state has met its burden.[8]

Officer Cole's continued questioning of Ladd on December 15 infringed Ladd's constitutional rights, *see Michigan v. Mos-*

*ley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), but it is not contended that any information was furnished so as to lead to the subsequent statements. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Moreover, in light of the state troopers' compliance with the mandates of *Miranda* after December 15 and Ladd's own conduct, the taint from the original violations was dissipated. Therefore, the confessions obtained from Ladd on January 31 and February 1 were not necessarily inadmissible.

The statements made by Ladd on December 16 do not pose any problems under *Miranda* since that case concerns the introduction of statements "stemming from custodial interrogation" not ones which are volunteered. *Miranda, supra* 384 U.S. at 478, 86 S.Ct. 1602. *See also Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 1245, 51 L.Ed.2d 424 (1977)[9] (Powell, J., concurring). The record is not entirely clear, but it does appear that Ladd volunteered to take a polygraph test and even provided Inspector Vaden with a list of nonincriminating questions and answers concerning his involvement in the Rich murder. Thus he cannot complain that these were obtained in violation of his con-

---

**8.** We recognize that courts are not in agreement as to whether a defendant validly waives his *Miranda* rights where he asks to see an attorney but when faced with incriminating evidence or renewed interrogation by the police makes a confession. *Compare, e. g., Hill v. Whealon,* 490 F.2d 629 (6th Cir. 1974). *See also United States v. Jeffery,* 473 F.2d 268 (9th Cir. 1973); *United States ex rel. Williams v. Twomey,* 467 F.2d 1248 (7th Cir. 1972).

California takes the position that a confession elicited in any manner by the police, no matter how gentle the inquiry, is inadmissible under *Miranda* after a request has been made to see an attorney. *People v. Enriquez,* 19 Cal.3d 221, 137 Cal.Rptr. 171, 561 P.2d 261 (1977); *People v. Superior Court of Mono County,* 15 Cal.3d 729, 542 P.2d 1390, 125 Cal. Rptr. 798 (1975); *People v. Randall,* 1 Cal.3d 948, 464 P.2d 114, 83 Cal.Rptr. 658 (1970); *People v. Ireland,* 70 Cal.2d 522, 450 P.2d 580, 75 Cal.Rptr. 188 (1969); *People v. Fioritto,* 68 Cal.2d 714, 441 P.2d 625, 68 Cal.Rptr. 817 (1968). Such a view facilitates the determination of whether police conduct has violated an accused's constitutional rights since only state-

ments obtained from defendants who on their own initiative volunteer to talk to police would be admissible. However, we feel that this position circumscribes too narrowly the permissible scope of interrogation. Therefore we decline to adopt such a broad rule, and will instead carefully scrutinize the particular facts before us. *See Lewis v. State,* 565 P.2d 846 (Alaska 1977).

**9.** *Brewer, supra,* is inapposite to the case at bar since it concerns the denial of sixth amendment rights under the rule of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In *Brewer,* the defendant who had been arraigned consulted with two attorneys who obtained an agreement from the police not to question him during the journey from Davenport, where he was arraigned, to Des Moines. In violation of this agreement, the police elicited a confession from Williams by appealing to his religious convictions. 430 U.S. 392, 97 S.Ct. at 1236. The Court held that under these circumstances Williams did not waive his sixth amendment right to counsel.

stitutional rights. At no time was Ladd denied his right to counsel, and there is no indication that the state in any manner impeded his efforts to secure counsel as indicated by the fact that he was visited by at least seven attorneys. Moreover, by December 19, he did have counsel representing him on the federal charge, and he voluntarily decided not to heed that attorney's advice to remain silent. On December 20, when Ladd was informed that Rich's body had been recovered, he signed a written waiver of his constitutional rights and then told Inspector Vaden that he wanted to talk about his involvement with Rich, despite advice from Mr. Rehbock not to do so until he had consulted with an attorney.

From December 20, 1973 through March 4, 1974, Ladd continued to volunteer information despite his lack of counsel. Under these circumstances we find that Ladd waived his privilege against self-incrimination and his right to counsel. Therefore, the confessions obtained from him were properly admitted into evidence.[10]

 Ladd also argues he was denied due process because his confessions were involuntarily made. A confession is not admissible into evidence unless it is voluntary. *E. g., Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *Schade v. State,* 512 P.2d 907, 916 (Alaska 1973). *See also Lego v. Twomey,* 404 U.S. 477, 484–85, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). In determining whether a confession is the product of a free will or was the product of a mind overborne by coercion the totality of circumstances surrounding the confession must be considered. *Schade, supra,* at 916–917.

 The record supports the trial court's conclusion that Ladd's statements were not the product of a will overborne by coercion but were voluntarily made. He was placed in a solitary confinement cell for his own protection since there were purportedly threats made on his life. The loss of weight was self-induced and the dosage of tranquilizers that he was given was quite moderate. Although his visitors were monitored by the federal marshal he was permitted to see at least seven attorneys, two clergymen, a bondsman and his fiancee. Ladd even wrote a letter thanking the correctional officers for the treatment he was receiving.

Ladd argues that his confession was made in exchange for Inspector Vaden's promise not to prosecute Virginia Pinnick. The testimony is conflicting about what happened on January 31 when Ladd and Inspector Vaden met in the prison library, especially since Ladd's account of what happened changed from the suppression hearing to the trial. In light of this and the indications that Ladd implicated Pinnick in the Rich murder, it does not appear that Ladd confessed in the belief that to do so would save her from prosecution.

Thus our review of the record leads us to the conclusion that the statements Ladd made on January 31, February 1, 2, 4, and March 6 were not obtained in violation of his constitutional rights. Therefore, the superior court did not err in denying the motions to suppress these statements.

II

 Ladd's next point on appeal is that the trial court erred in failing to instruct the jury that they should consider the confessions only if they found them voluntary beyond a reasonable doubt.

Criminal Rule 30 provides that for a party to assign the giving of, or failure to give, an instruction as error on appeal, a specific objection to that instruction must be made at trial. Alaska R.Crim.Pro. 30(a): *see Evans v. State,* 550 P.2d 830, 843 (Alaska 1976); *Eliason v. State,* 511 P.2d 1066,

10. We cannot tell from the record why Ladd was unable to obtain an attorney to represent him. Apparently, Inspector Vaden contacted the district attorney's office to ask for help in securing counsel for Ladd. Larry Kulik also called several attorneys but nothing came of these efforts. Nonetheless, Ladd did receive visits from seven attorneys and the state did nothing to interfere with Ladd's ability to obtain an attorney.

1071–72 (Alaska 1973). The record shows that Ladd's attorney objected to the court's refusal to give his proposed instruction. However, the instruction which was actually given was substantially the same. There was no specific objection made to that instruction on the ground that it did not require the jury to apply the reasonable doubt standard, nor did the proposed instruction contain any such language. Therefore, we need not consider this point further on appeal.

## III

Ladd's third point on appeal is that it was prejudicial error to permit the prosecutor to make several references to a prior trial at which Ladd was acquitted of the murder of Frank Rezk. The state argues that the evidence concerning the prior murder trial was admissible to show Ladd's motive and intent. The evidence in question showed that Ladd was in the process of buying Cindy's Massage Parlor from Frank Rezk and that he owed $3,000 for it around the time that Frank Rezk was murdered. John Rich testified against Ladd at the Rezk trial. His testimony was that on the Friday before Rezk was murdered Ladd had unsuccessfully tried to borrow $3,000 from Rich in order to make his final payment to Rezk. After the trial Rich gained control over the massage parlor and in his February 1 statement Ladd expressed considerable resentment against Rich for this. During the Rich murder trial the judge cautioned the jury that in considering evidence from the prior trial:

> "[W]e're concerned about . . . the testimony relating to Mr. Rich's prior participation in that trial and we're concerned about . . . Cindy's Massage Parlor. Other than that, we're not concerned with the Rezk trial."

▮ We have held that evidence concerning previous crimes is admissible if it is relevant to prove a material fact other than the criminal disposition of the defendant. *Watson v. State,* 387 P.2d 289, 293 (Alaska 1963). *See generally United States v. Webb,* 466 F.2d 1352, 1353 (9th Cir. 1972); C. McCormick, *Handbook of the Law of Evidence,* 447–51 (2d ed. 1972). Thus evidence of other crimes tending to show intent and motive is admissible against the defendant. *E. g., Freeman v. State,* 486 P.2d 967, 977 (Alaska 1971); *Gafford v. State,* 440 P.2d 405, 408 (Alaska 1968). That the defendant was acquitted of the prior offense does not preclude the introduction of evidence of that offense, but its probative value must outweigh its prejudicial impact. *Eubanks v. State,* 516 P.2d 726, 729 (Alaska 1973). We will reverse the trial court only for a clear abuse of discretion in admitting such evidence of prior offenses. *See Newsom v. State,* 533 P.2d 904, 908 (Alaska 1975).

▮ The evidence the prosecution introduced tended to show that Ladd may have desired to kill Rich to recover the massage parlor and to obtain revenge for Rich's testimony against him. Hence it was introduced for its relevance on the issue of intent and motive and not to show criminal predisposition. In light of the factual complexity of this case, we believe that the probative value of this evidence outweighed its potential prejudicial impact. We are unable to say that the court abused its discretion in admitting this evidence.

## IV

At the close of the evidence Ladd made a motion for an acquittal under Criminal Rule 29 [11] on Count II of the indictment on the ground that there was insufficient evidence of kidnapping to go to the jury. He argued that there was no evidence to show that he had engaged in the actual abduction of Rich, and that he had not been indicted under the statute for conspiracy to kidnap. *See* AS 11.15.270. The motion was denied.

---

11. Alaska R.Crim.Pro. 29(a) provides in part: "The court, on motion of a defendant or of its own motion, shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses."

The state concedes in its brief that Ladd had not performed any direct physical act himself in connection with Rich's abduction, but points out that Ladd was tried on an accomplice theory under AS 12.15.010 [12] and that the jury was so instructed. *See Trounce v. State,* 498 P.2d 106, 109 (Alaska 1972).

A motion for acquittal under Criminal Rule 29(a) puts into issue the sufficiency of the state's evidence. Criminal Rule 29(a); *Trounce, supra* at 110; *Beavers v. State,* 492 P.2d 88, 97 (Alaska 1971). On appeal from a denial of such a motion, we must view the evidence and all inferences that may be drawn therefrom in a light most favorable to the state. *Trounce, supra* at 110.

The prosecution introduced into evidence a note signed by Rich the night he was killed, as well as evidence that this note was prepared in early August as part of the plan to make it appear that Rich made a deal with Ladd and then left town. Benny Ramey testified for the state that on August 8 he, Ladd and Caye Mason bought a suit for Ramey to wear when he flew to Seattle under the name of John Rich.[13] At the trial Ladd testified, however, that he knew nothing about a kidnapping plot.

The prosecution also introduced evidence to show that the power of attorney, purportedly given to Ladd by Rich, was actually prepared under Ladd's direction, though Ladd contended that it had been prepared by Gary Zieger who directed the kidnap plot. Benny Ramey, however, testified that it was Ladd not Zieger who instructed him to make an appointment to meet Rich and to get him to drive out to Eagle River, using force if necessary, on the pretext of selling him guns.

There was some question as to how Benny Ramey acquired the gun he used to force Rich out to Eagle River. He testified that Ladd gave him the gun which was his. The officer who recovered Rich's car from Ladd also stated that Ladd indicated that the weapon belonged to him. Ladd's testimony, however, is inconsistent. On December 20 he told Inspector Vaden that the gun belonged to John Rich, but at the trial he testified that it belonged to Benny Ramey. Viewing this evidence most favorably toward the state, it would raise a strong inference that Ladd was himself a prime mover in the kidnap plot,[14] and though not physically involved in the kidnap of Rich, was involved as an aider and abetter. We conclude, therefore, that "fair-minded men in the exercise of reasonable judgment" could differ on the question of whether Ladd's guilt had been established beyond a reasonable doubt. *Bush v. State,* 397 P.2d 616, 618 (Alaska 1964). Therefore, the trial court properly denied the motion for judgment of acquittal.

## V

The next point on appeal is that the trial court erred in denying the motion for a

---

12. AS 12.15.010 provides:
 "The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or, though not present, aid and abet in its commission, shall be prosecuted, tried and punished as principals."
 *See McCurry v. State,* 538 P.2d 100, 103 n.7 (Alaska 1975); *Trounce v. State,* 498 P.2d 106, 109 (Alaska 1972).

13. Defense counsel attempted to impeach Ramey's testimony by showing he was biased since he had bargained to testify in exchange for rescinding a one-third mandatory minimum sentence before parole. However, for the purposes of this appeal we must view the testimony most favorably towards the state. *Beavers, supra* at 97.

14. When Judge Fitzgerald denied the motion for acquittal at the close of the state's case he said:
 "I think [the testimony] presents a jury issue for the reason that I'm concerned about the testimony of Ramey as to how he acquired the .45 that was—that which he testifies he used in compelling Rich to get in the Cadillac to drive to Eagle River. I am also taking into consideration that that weapon was subsequently recovered from custody of your client as having been in the glove compartment of the Cadillac. . . . ."

new trial on the ground that the prosecutor, Mr. Mackey, was armed during the course of the trial. Ladd argues that he was prejudiced because this suggested to the jurors that he had dangerous tendencies. The state argued and the trial court agreed that any such prejudicial effect was speculative since no evidence was presented to show that the jurors were even aware that Mr. Mackey was armed.

At the hearing on the motion, Mr. Mackey explained he had been armed on occasion during the trial because there was a shortage of personnel, and he had been guarding the defendant, and transporting him to the court from the jail. He also stated that he carried a gun on occasion to protect himself from certain California prisoners who had threatened him, but that throughout most of the trial his gun was kept locked in his office. He also said that an observer might have thought he was still wearing a gun since he kept the holster on.

We have not previously considered this question. *Anthony v. State*, 521 P.2d 486 (Alaska 1974), the case appellant cites in support of his argument that the prosecutor's conduct denied appellant the "right to face the jury with the appearance and dignity of a free and innocent man," is inapposite. In that case, it was held that the presentation of the accused before the jury unshaven and in prison garb, detracted from this right. The cases on which *Anthony* was based all concern the physical appearance of defendants and the use of physical restraint on them.[15]

There is no evidence to show that any juror was even aware that Mr. Mackey was armed. Therefore, we conclude that the

trial court did not abuse its discretion by denying the motion for a new trial. *Darling v. State*, 520 P.2d 793 (Alaska 1974); *Johnson v. State*, 501 P.2d 762, 765 (Alaska 1972); *Pedersen v. State*, 420 P.2d 327 (Alaska 1966).

## VI

Ladd's final point on appeal is that the imposition of concurrent sentences for kidnapping and murder placed him twice in jeopardy for the same offense in violation of his constitutional rights. *See* U.S.Const. amend. V; Alaska Const. art. I, § 9.

Ladd's double jeopardy argument is based on *Whitton v. State*, 479 P.2d 302 (Alaska 1970), where we held that Alaska's constitutional ban against double jeopardy prevents the imposition of multiple sentences for the same offense.[16] In *Whitton* we abandoned the "same evidence test"[17] to determine what constitutes one offense in favor of a test which assesses "the quality of the differences, if any exist, between the separate statutory offenses, as such differences relate to the basic interests sought to be vindicated or protected by the statutes." *Id.* at 312.

In determining whether to impose multiple punishments we stated:

"The trial judge first would compare the different statutes in question, as they apply to the facts of the case, to determine whether there were involved differences in intent or conduct. He would then judge any such differences he found in light of the basic interests of society to be vindicated or protected, and decide

---

**15.** In *Kennedy v. Cardwell*, 487 F.2d 101 (6th Cir. 1973), one of the cases relied on in *Anthony*, the court pointed out that even where the defendant is physically restrained for a short period of time there must be an affirmative showing of prejudice before the trial court will be reversed. *Id.* at 109.

**16.** *Accord, State v. Occhipinti*, 562 P.2d 348 (Alaska 1977); *McCracken v. State*, 521 P.2d 499 (Alaska 1974); *Thessen v. State*, 508 P.2d 1192 (Alaska 1973); *Mead v. State*, 489 P.2d 738 (Alaska 1971); *Robinson v. State*, 484 P.2d 686 (Alaska 1971).

**17.** Thus the cases Ladd cites from other jurisdictions have no applicability since they follow the "same evidence," "same transaction" or "one course of conduct" approach. *E. g.*, *People v. Milan*, 9 Cal.3d 185, 507 P.2d 956, 107 Cal.Rptr. 68 (1973); *People v. Beamon*, 8 Cal.3d 625, 504 P.2d 905, 105 Cal.Rptr. 681 (1973); *People v. Teale*, 63 Cal.2d 178, 404 P.2d 209, 45 Cal.Rptr. 729 (1965), *rev'd on other grounds sub nom. Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

whether those differences were substantial or significant enough to warrant multiple punishments. The social interests to be considered would include the nature of personal, property or other rights sought to be protected, and the broad objectives of criminal law such as punishment of the criminal for his crime, rehabilitation of the criminal, and the prevention of future crimes."

"If such differences in intent or conduct are significant or substantial in relation to the social interests involved, multiple sentences may be imposed, and the constitutional prohibition against double jeopardy will not be violated. But if there are no such differences, or if they are insignificant or insubstantial, then only one sentence may be imposed under double jeopardy." *Id.* at 312.

██ We concluded that the imposition of concurrent sentences for robbery, *see* AS 11.15.240, and the use of a firearm during the commission of a robbery, *see* AS 11.15.-295, placed Whitton twice in jeopardy. We therefore limited punishment to that imposed for carrying a firearm during the commission of a robbery, the offense for which the legislature had prescribed the greater penalty. *Id.* at 312.[18]

Applying *Whitton* to the case at bar, it is first necessary to examine the kidnapping and murder statutes as they were applied to see whether there are substantial differences in the intent or conduct required for a conviction.[19]

The jury was instructed on the elements of first degree murder and kidnapping as follows:

"The elements of the crime of murder in the first degree charged in Count I of the indictment are:

That on or about the 22nd day of August 1973, at or near Eagle River, Alaska,

The defendant, Wesley Ladd, being of sound memory and discretion,

purposely and with deliberate and premeditated malice, killed John Francis Rich.

The elements of the crime of kidnapping charged in Count II of the indictment are:

That on or about the 22nd day of August 1973,

the defendant, Wesley Ladd, knowingly and without lawful reason abducted or carried away, John Francis Rich, from Anchorage, Alaska or its vicinity to a place at or near Eagle River, Alaska. So that John Francis Rich could be restrained or held."

The instructions given, and verdict reached, concern two distinct species of conduct. On the murder count the jury was instructed that they must find that there was an unlawful killing of Rich by Ladd. On the kidnapping count, they were required to find that Rich was "abducted or carried away." Ladd was actually found guilty of this on a theory of accomplice liability.

There were also differences in the *mens rea* with which these acts were carried out. For the kidnapping, the jury was instructed they must find that Ladd "knowingly"[20] abducted or carried Rich away. They were also told that Ladd must have intended[21] to

---

**18.** We also pointed out that to facilitate our review of sentencing, the trial judge must affirmatively state the reasons for his conclusion that multiple sentences may be constitutionally imposed. This statement should include "relevant factual and other considerations which led him to such a decision". *Id.* at 312.

**19.** *See* nn. 1 and 2, *supra* at 1–2.

**20.** Model Penal Code § 2.02(2)(b) defines knowingly as follows:
"A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result."

**21.** Perkins defines intent as follows:
"Intent includes those consequences which (a) represent the very purpose for which an act is done (regardless of likelihood of occurrence), or (b) are known to be substantially certain to result (regardless of desire)." R.

kidnap Rich for the purpose of killing him. The inclusion of the phrase "for the purpose of killing him" supplies the unlawful reason required by the statute. As to the murder, the jury was told that the formulation of the intent to kill must result from deliberation and reflection.

■ We must next consider the differences between the statutes in relation to the social interests to be vindicated. If these differences are substantial in relation to the social interests at stake, then multiple sentences may be imposed without violating the ban on double jeopardy. *Whitton, supra* at 312. The social interests to be considered include "the nature of personal, property or other rights sought to be protected . . ." by the statute. *Id.* Kidnapping and murder are both crimes against the person. Kidnapping has been described as "aggravated false imprisonment." Perkins, *supra* at 176. False imprisonment is a tort designed to protect the personal interest in freedom from restraint of movement. W. Prosser, *The Law of Torts* § 11 at 42 (4th ed. 1971).

■ Where the elements of asportation and force or deception are added, thus elevating the tort of false imprisonment to the crime of kidnapping, *see* Perkins, *supra* at 171–78, a greater danger to personal security is posed. We agree with the state's argument that kidnapping is designed to protect the general personal security of citizens both in their persons and property. It is significant in the case at bar that one result of kidnapping Rich was to violate his property interest by unlawfully enabling Ladd to obtain control of the massage parlor. Additionally, the crime of murder protects the greater and distinct interest in the sanctity of life.

We conclude that the differences between the conduct and intent required for kidnapping and murder are substantial when viewed in relation to the overlapping but nonetheless distinct social interests they protect. Therefore, the imposition of concurrent sentences did not place Ladd twice in jeopardy for the same offense.

AFFIRMED.

RABINOWITZ, Justice, dissenting.

I have concluded that under the particular facts of this case, Ladd's motion to suppress should have been granted by the superior court. For, in my view, Ladd was denied the right to the assistance of counsel under both the United States and Alaska Constitutions [1] and was further denied the protections afforded an accused in custody by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Central to analysis of the record in the instant case are the following events: At the time he was first arrested on December 15, 1973, at Cordova, Alaska, for a federal offense, Alaska State Trooper Cole advised Ladd of his right to remain silent and to the assistance of counsel at any questioning. Ladd then requested to have an attorney to represent him before answering any questions concerning Rich. After Ladd unsuccessfully attempted to obtain the services of an attorney, he advised Trooper Cole of this fact and specifically informed the officer that he did not want to make any statement until he had consulted with an attorney. Of controlling significance is the fact that despite the foregoing, Trooper Cole then informed Ladd that there were some questions he wished to ask him.

Thus, I cannot agree with the majority that Trooper Cole's conduct at this initial interrogation is not in issue. Here the record shows that from Ladd's first encounter with Trooper Cole until the February 4th correction by Ladd of the transcript of his

---

Perkins, *Perkins on Criminal Law* 747 (2d ed. 1969).

1. In the sixth amendment to the United States Constitution, it is provided:

 In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense.

In article I, section 11, of the Alaska Constitution, it is provided:

 In all criminal prosecutions, the accused shall have the right . . . to have the assistance of counsel for his defense.

taped statement of February 1, 1977, Ladd never received the benefit of the assistance of counsel with respect to the Rich homicide.

Not only was Ladd questioned by Trooper Cole after he had advised the officer that he desired to speak to counsel before answering Cole's question but the same pattern emerges in the December 16 and 20 meetings between Ladd and Trooper Vaden. Here, although Ladd again makes reference to his desire to consult with an attorney before questioning, he is in fact questioned by Trooper Vaden after being given a complete *Miranda* warning by Vaden.

Given the totality of the factual circumstances of Ladd's incarceration and interrogations, I conclude that the suppression motion should have been granted because the statements in question were obtained in violation of Ladd's right to counsel as provided in the Constitutions of the United States and Alaska. *See Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Additionally, in the factual context of the case at bar, I cannot find that Ladd had waived his right to the assistance of counsel. As the United States Supreme Court said in *Michigan v. Mosley,*[2]

> [w]e therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'

Here the record fails to demonstrate that Ladd's request to terminate questioning was "scrupulously honored," and thus a valid waiver by Ladd of his *Miranda* rights cannot be found. *See United States v. Jef-* *fery,* 473 F.2d 268 (9th Cir. 1973); *United States ex rel. Williams v. Twomey,* 467 F.2d 1248 (7th Cir. 1972); *United States v. Crisp,* 435 F.2d 354 (7th Cir. 1970). Contrary to the majority's view, the facts here indicate a situation where defendant requested counsel, asserted his right to remain silent, but nonetheless confessed after he was faced with renewed interrogations.[3]

---

**2.** 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975). The Supreme Court found the statements admissible in *Mosley.* However that case differs from the case at bar, in that Ladd made an initial request for counsel followed by allusions at subsequent interrogations to the fact that he was not represented. After each of these occurrences, the troopers continued the questioning. In *Mosley,* "[w]hen Mosley stated that he did not want to discuss the robberies, Detective Cowie immediately ceased the interrogation and did not try either to resume the questioning or in any way to per-

suade Mosley to reconsider his position." 423 U.S. at 104, 96 S.Ct. at 326, 46 L.Ed.2d at 322.

**3.** It should be noted that Ladd was in continuous custody from the time of the earliest statements to the last; much of this time he was in solitary confinement. Given these facts, there was an insufficient break to justify a holding that the taint from the original deprivations of Ladd's right to counsel was dissipated. *See United States ex rel. Williams v. Twomey,* 467 F.2d 1248, 1252 (7th Cir. 1972).