Ross T. SHEAKLEY, Appellant,

v.

STATE of Alaska, Appellee.

No. 4936.

Court of Appeals of Alaska.

May 13, 1982.

Steven G. Marks and Michael O'Brien, Asst. Public Defenders, Juneau, and Brian Shortell, Public Defender, Anchorage, for appellant.

Richard Svobodny, Asst. Dist. Atty., Patrick J. Gullufsen, Dist. Atty., and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

OPINION

Before BRYNER, C. J., and COATS, and SINGLETON, JJ.

BRYNER, Chief Judge.

On September 4, 1979, Ross Sheakley was convicted of mayhem, after a jury trial. He had previously entered pleas of guilty to charges of assault with a dangerous weapon (ADW) and joyriding.[1] Because Sheakley had been convicted of burglary in 1974, he was separately indicted for violation of former AS 12.55.050, Alaska's former habitual criminal statute. Sheakley was arraigned on the habitual criminal charge and entered a plea of guilty to it in advance of his trial on the mayhem charge. Thus, upon conviction of the substantive offenses with which he was charged, Sheakley was subject to sentencing as an habitual criminal under former AS 12.55.050.[2] Sheakley now challenges his mayhem conviction on several grounds and also argues that the aggregate sentence he received for all three of his offenses was excessive.

The relevant facts are not in dispute. Early in the morning of Friday, February 10, 1979, Ross Sheakley and Elizabeth Peterson were in the Riptide Bar in Haines. Sheakley and Peterson had been living together for some time, but they were having difficulties with their relationship. After some conversation, Peterson left the bar; Sheakley followed her and began to beat her with his fists. He then kicked her with his heavy hiking boots.

Witnesses called the police, and Officer Jeffrey Gorman arrived to attempt to break up the fight. Officer Gorman put Peterson in his car, and Sheakley got in too; Gorman asked Sheakley to get out. Sheakley then jumped on Gorman and knocked him to the ground, causing him to strike his head and lose consciousness for a brief period of time. As Gorman came to, Sheakley was sitting on top of him and striking him. Gorman

---

1. Sheakley was convicted of mayhem under former AS 11.15.140; his conviction of assault with a dangerous weapon was under former AS 11.15.220; his joyriding conviction, a misdemeanor, was under former AS 28.35.010(a).

2. For persons who were convicted of second felonies, AS 12.55.050 doubled the maximum term of imprisonment specifically authorized by law for the offense charged. Thus, for example, because of Sheakley's guilty plea to the habitual criminal indictment, upon his conviction of mayhem, the maximum possible term of imprisonment that the court could impose was 40 years, twice the term provided for under former AS 11.15.140.

The appellate record designated by the parties did not originally include Sheakley's separate indictment under AS 12.55.050. This court subsequently ordered a supplemental record, which included the habitual criminal indict-

ment as well as court records reflecting Sheakley's arraignment and his plea of guilty to the habitual criminal charge. We note that the written judgment formally entered against Sheakley by the superior court reflects only his conviction of the substantive charges and fails to make specific reference to the habitual criminal conviction. Because no issue has been raised on appeal with respect to Sheakley's conviction as an habitual criminal, and because a review of the record of Sheakley's sentencing proceedings clearly reflects an understanding by the parties and the sentencing judge that Sheakley was being sentenced under the enhanced penalty provisions of the habitual criminal act, we deem the omission of reference to AS 12.55.050 from the written judgment to be in the nature of a clerical error, and we direct that the judgment be appropriately amended upon remand. See Alaska R.Crim.P. 35(a).

unsuccessfully attempted to use his mace on Sheakley as Sheakley struggled for the officer's baton, and Gorman was knocked out for the second time.

As Gorman came to again, Sheakley was kneeling on top of him with one index finger extended, braced by his other hand. Sheakley forced his finger into the eye socket of Officer Gorman and gouged out his eye. Officer Gorman attempted to plead with Sheakley, but Sheakley told Gorman that when he was done gouging out the one eye he was going to gouge out the other eye, drag Gorman off into the bushes and kill him. Sheakley then took the officer's service revolver.

At that time, Gorman managed to get away and seek help in the Riptide Bar. Sheakley shot the officer's gun once, then grabbed Elizabeth Peterson by the hair, pulled her into the patrol vehicle and drove off. At trial Sheakley claimed he could remember everything that happened up until he left the Riptide Bar with Peterson, but could not remember the assault upon her. He also remembered Gorman breaking up the fight, punching Gorman to the ground and beating him, firing the gun and driving away. Sheakley claimed that he did not recollect gouging the officer's eye.

Haines Police Chief John Fain arrested Ross Sheakley at some time between 5:00 and 5:30 a. m. En route to the police station, Chief Fain read Sheakley the *Miranda* [3] warnings. Sheakley told Fain that he did not need to tell him those rights and that he already knew them; Fain read him his rights anyway. Sheakley was not interrogated at that time. After Sheakley was placed in a cell, he asked to call his attorney, Richard Folta. Chief Fain indicated that Folta would not be in his office at that hour, that he lived outside of Haines, and that there was no telephone at his home. Sheakley was told to wait until 9:00 a. m., and he responded that it would be all right.

At approximately 9:00 a. m. Chief Fain called Folta. There was a recording device on Folta's phone, from which it appeared that Folta was not in his office. Sheakley was told of the unavailability of Folta but did not request to speak with anybody else. He did ask about his glasses which he lost in the fight.

Around noon Sheakley asked to speak with Chief Fain. Fain asked "What about?" and Sheakley responded "Well I want to tell you my side of the story." Sheakley was taken out of the cell and brought to the telephone. Chief Fain dialed Folta's office telephone number and again received the tape-recorded message. He gave the telephone to Sheakley, who did not leave a message on the recorder. Sheakley inquired about the availability of other counsel in Haines, and Chief Fain told him that there were only three attorneys, Richard Folta, Linn Asper, who shared offices with Richard Folta, and Tom Blanton, who was the city attorney. Although the police chief was aware that Sheakley had previously been represented by the public defender agency, the chief did not suggest calling their office in Juneau; neither did Sheakley ask to call the public defender. Sheakley asked to speak with Blanton, and Fain contacted Blanton at his home.

Blanton talked to Sheakley for a couple of minutes. He informed Sheakley that he had a conflict of interest and could not represent him. Blanton also told Sheakley that he would probably soon be transported to Juneau, that a public defender could be appointed for him there if he was without funds, and that he need not make any statements to the police at all. At the end of the telephone conversation, Chief Fain asked if Sheakley still wanted to talk to him, and Sheakley responded that he did. Sheakley was again given the *Miranda* warnings, and only then was he questioned by Chief Fain and an assistant district attorney from Juneau. Prior to trial, an evidentiary hearing was held before Judge Thomas Stewart on a motion to suppress Sheakley's statement; that motion was denied.

Sheakley was convicted, after trial, of mayhem on Officer Gorman; prior to trial

---

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

he had entered pleas of guilty to the charges of ADW against Elizabeth Peterson and joyriding. He was sentenced by Judge Thomas Schulz to twenty years for mayhem, seven years for the ADW and six months for joyriding in the police car. The sentences for mayhem and ADW were imposed consecutively, with the joyriding sentence made to run concurrently. After trial, Sheakley moved to modify his sentence on the basis that the injuries caused by the mayhem were not so great as originally thought; this motion was denied.

Sheakley contends, first, that the superior court erred in denying his motion to suppress the statement he made to Chief Fain. He argues that his request for counsel before interrogation was not "fully honored." He also argues, apparently in the alternative, that the advice he received from Blanton did not amount to effective assistance of counsel. The state responds to this alternative argument by stating that Blanton did not form an attorney-client relationship with the defendant and that, in any event, his advice was reasonable under Alaska standards.

■ Before calling Blanton, Chief Fain advised Sheakley that Blanton was the city attorney for Haines. Blanton testified at the evidentiary hearing that he prefaced the conversation with Sheakley by telling him that he had a conflict with the case and could not represent him. Blanton did almost all of the talking; Sheakley told Blanton nothing about the case. In the course of this brief conversation, Blanton told Sheakley that he would probably be transported immediately to Juneau, where he would appear before a magistrate to consider the issue of bail. Blanton informed Sheakley that the public defender agency had an office in Juneau and that an attorney from the agency would be appointed to represent him there if he could not afford his own counsel. Sheakley was advised by Blanton that he "need not make any statements to the police at the time at all." There is nothing in the record to indicate, nor does Sheakley assert, that Blanton did anything to mislead him into thinking that

an attorney-client relationship had been formed. Under these circumstances we hold that there is no merit to Sheakley's claim of ineffective assistance of counsel.

Sheakley's claim more properly presents the questions whether his request for counsel was fully honored, and, to the extent that it was not, whether his statement to Chief Fain was voluntarily given.

■ The appropriate test for determining the voluntariness of a confession given after an initial request for counsel has been made has recently been stated in the following terms:

> The burden is always on the state to prove that in making an incriminating statement, a suspect voluntarily waived his or her right to remain silent and to have counsel present during questioning. *North Carolina v. Butler*, 441 U.S. 369, 372, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979); *Hampton v. State*, 569 P.2d 138, 141 n.6 (Alaska 1977), *cert. denied*, 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978). If a suspect expresses a desire to consult counsel before discussing his or her case with the police, and an incriminating statement is subsequently taken without counsel present, the state's burden in demonstrating a voluntary waiver is a very heavy one. *Ladd v. State*, 568 P.2d 960, 966 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978). The presumption is that ignoring or rebuffing a suspect's invocation of his or her constitutional rights will convince the suspect that such rights are illusory. *See Michigan v. Mosley*, 423 U.S. 96, 110 n.2, 96 S.Ct. 321, 329 n.2, 46 L.Ed.2d 313, 325 n.2 (1975) (White, J., concurring); *Miranda v. Arizona*, 384 U.S. 436, 466, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694, 719 (1966).

*Mallott v. State*, 608 P.2d 737, 741–42 (Alaska 1980) (footnote omitted).

In the earlier case of *Quick v. State*, 599 P.2d 712 (Alaska 1979), this same standard was applied, and a statement given under circumstances analogous to those of the case at bar was upheld. The court in *Quick* stated:

It is undisputed that the police immediately stopped questioning Jackson as soon as he requested an attorney. The renewed conversation was initiated by Jackson who, according to his version of events, asked whether Ray Quick had talked. Jackson testified that the knowledge that Quick had talked 'really broke me up.' The transcript indicates, however, that the police asked him again before questioning whether he wanted to proceed. He indicated he was willing to do so. The police actions were entirely reasonable under the circumstances, and we agree that Jackson's statement was admissible.

*Id.* at 722.

In this case, Chief Fain did not question Sheakley before or after his request for counsel. After making his initial request, Sheakley took the initiative and attempted to tell Fain his "side of the story." Even at this stage, Fain refrained from taking any statement and assisted Sheakley in contacting an attorney. After Sheakley spoke with Blanton, he was again advised of his rights by Chief Fain and was once more asked if he wanted to make a statement. Only when Sheakley replied that he did was he allowed to proceed.

Fain took no actions that might have led Sheakley to believe his rights were illusory; every request made by Sheakley was honored. Sheakley could not reasonably have believed that he was being held incommunicado. He was given the opportunity to leave a phone message but did not take it, and he knew as well as the police that he could reach the public defender by phone in Juneau. The record is devoid of any indication that Sheakley thought he was being obstructed in obtaining counsel. And there is nothing in the record to justify a conclusion that it would have been useless for him to call other attorneys or to maintain silence until Folta returned. *See Mallott v. State*, 608 P.2d at 743.

Sheakley contends that the police should have gone to get Folta at his home or that they should have called the public defender in Juneau in order to fully honor Sheakley's request for counsel. However, Sheakley never asked that the police do these things, and Fain testified that he would have been willing to go get Folta if Sheakley had asked. Sheakley had been a client of the public defender before and knew that the agency was not located in Haines. The police were under no obligation to continue calling until they reached an attorney who happened to be in and who could represent Sheakley.

We believe that the actions of the police under these circumstances were quite reasonable. As our supreme court has held, *Miranda* "does not require that attorneys be producible on call, or that a *Miranda* warning include a timetable for an attorney's arrival." *Schade v. State*, 512 P.2d 907, 915 (Alaska 1973), *quoting, Mayzak v. United States*, 402 F.2d 152, 155 (5th Cir. 1968); *see also Vail v. State*, 599 P.2d 1371, 1379 (Alaska 1979). Other jurisdictions have similarly followed the principle that the immediate availability of an attorney is not a prerequisite to a valid *Miranda* waiver. *See, e.g., State v. Marks*, 113 Ariz. 71, 546 P.2d 807, 811 (1976) (*en banc*); *State v. Blanchey*, 75 Wash.2d 926, 454 P.2d 841, 846 (1969), *cert. denied*, 396 U.S. 1045, 90 S.Ct. 694, 24 L.Ed.2d 688 (1970).

■ Upon review of the record in the present case, we conclude that Sheakley's initial request for counsel was fully honored and that he subsequently waived it voluntarily. Sheakley's statement to Chief Fain was thus properly admitted against him.

Sheakley next contends that the court erred in allowing the jury to see several photographs, which showed the wounds to Officer Gorman's eye. Sheakley argues that, since a stipulation had been entered that Sheakley gouged out Gorman's eye, the photographs were irrelevant to the main issue at trial, which was whether Sheakley had the state of mind requisite for mayhem when he assaulted Gorman. Sheakley also objects to admission of the hair that he pulled from Elizabeth Peterson's head as being inflammatory and irrelevant, since he pled guilty to the assault on Peterson.

The standard for admission of illustrative evidence was set forth in *Stevens v. State*, 443 P.2d 600, 603 (Alaska 1968), *cert. denied*, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969) (footnotes omitted):

> This court has held that a photograph is admissible in evidence in the discretion of the trial judge, as an aid to the court or jury, after it has been shown to be a faithful representation of whatever it purports to depict, provided it is relevant, and provided its evidentiary value is not outweighed by any prejudice it might create.

*See also Valentine v. State*, 617 P.2d 751, 754 (Alaska 1980); *Sleziak v. State*, 454 P.2d 252, 261 (Alaska 1969), *cert. denied*, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969); *McIntyre v. State*, 379 P.2d 615, 617 (Alaska 1963).

Here, the black-and-white photographs of Gorman's eye are not any more shocking than one's mental picture of a gouged-out eye. They were probative in that they could give the jury a graphic impression of how difficult it would be to put out an eye without intending to do so. They were also probative in that they showed few other wounds to Gorman's face, making it less likely that Sheakley's act of gouging was unintended or simply part of a general assault. We conclude that the superior court did not abuse its discretion in admitting these photographs.

The hair was less relevant to the issues at trial, since Sheakley did plead guilty to the assault on Peterson. It was arguably admissible on the basis of testimonial completeness. *See Braham v. State*, 571 P.2d 631, 640–41 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978). In any case, it is hard to see it as prejudicial. The hair is mundane rather than inflammatory in appearance, with no blood or skin evident upon it. It pales in comparison to the photographs of Peterson's bruises, whose admission below is not contested by Sheakley. We believe that admission of the hair was within the discretion of the trial court; at worst it was harmless error. *See Love v. State*, 457 P.2d 622, 631 (Alaska 1969).

Sheakley further claims error relating to examination of his expert witness. The prosecutor, in cross-examining defense psychiatrist Aron Wolf, asked a number of questions which Sheakley contends were improper. Sheakley's trial counsel did not object to the cross-examination, but Sheakley now argues that the questioning constituted plain error. The state responds that the questions were not outside the bounds of reasonable cross-examination and, in any case, that they did not amount to plain error.

The first offending line of questioning related to Dr. Wolf's testimony in prior cases involving alcohol amnestic syndrome and the outcome of those cases. Without objection, the prosecution questioned Dr. Wolf about five specific cases in which he had apparently testified that the defendant suffered from alcohol amnestic syndrome, with blackouts similar to those claimed by Sheakley, and in which the jury had rejected his testimony and convicted the defendant.

In advancing his argument with respect to this line of examination, Sheakley relies on *People v. Morales*, 49 Cal.App.3d 134, 122 Cal.Rptr. 157, 164–65 (1975), and *People v. Fournier*, 86 Mich.App. 768, 273 N.W.2d 555, 560 (1978). While in both of these cases the courts did hold that questions relating to testimony of defense psychiatrists in prior, unrelated cases were irrelevant and improper, in both cases the questions were properly objected to.[4] Thus, these cases are not dispositive of the plain error issue.

The second line of cross-examination which Sheakley contests involved an attempt by the prosecution to discredit Dr. Wolf by making him appear to be foolish. Thus, the prosecution attempted to elicit testimony that Dr. Wolf had once taught a

---

**4.** In *Fournier*, moreover, the error in examining the defense psychiatrist was held to be harmless.

university level course in sexual dysfunction, a part of which included class participation with a surrogate sexual partner.[5] As it turned out, however, Dr. Wolf had not taught the course, but had only planned it, and his plans had called only for his class to be addressed by a person who had worked as a surrogate sexual partner. The prosecution further attempted to discredit Dr. Wolf by eliciting from him testimony that he had once publicly modeled male underwear. The occasion proved to be a fashion show held in Anchorage as a benefit for the Anchorage Arts Council, in which Dr. Wolf had modeled a bathrobe and underwear. Again, cross-examination on this line of questioning was not objected to.

■ In deciding whether reversible error was committed by these two lines of inquiry, we are bound by the plain-error doctrine. To constitute plain error, alleged misconduct must violate a substantial and important right of the accused, and it must be obviously prejudicial. *Tuckfield v. State*, 621 P.2d 1350, 1352 (Alaska 1981); *Randall v. State*, 583 P.2d 196, 200–01 (Alaska 1978). Both prongs of this test must be met. *Gaona v. State*, 630 P.2d 534, 540 (Alaska App.1981) (Bryner, C. J., concurring). To constitute plain error, improper cross-examination must result in a substantial interference with the defendant's right to a fair trial. *Randall v. State*, 583 P.2d at 200–01.

With respect to the prosecution's cross-examination of Dr. Wolf concerning his unsuccessful testimony in prior cases, we are inclined to agree with the holding of *People v. Morales*, 122 Cal.Rptr. at 164–65, in which the court stated:

We agree with defendant that the cross-examination was irrelevant and should not have been permitted. Although it was permissible to show that the expert had testified on other occasions for the public defender's office, it was going too far to bring out that he had previously stated a similar opinion with reference to similar facts in an effort to cast doubt on the credibility of his testimony. To the extent that it did tend to imply a bias to the jury, it placed upon the defense the unfair burden of justifying Dr. Root's testimony in the prior case as well as this one.

■ Although the cross-examination of Dr. Wolf concerning his testimony as a defense witness in prior cases may have been improper, we do not believe that it can fairly be said that the impropriety was obviously prejudicial. We note, first, that the impropriety of this line of examination was not entirely obvious, and it is at least arguable that, given Dr. Wolf's testimony on direct examination, cross-examination by the prosecution regarding his performance in other cases was permissible.[6] Moreover, while Sheakley's trial counsel might have been put at a disadvantage by his ignorance of the other cases that were the subject of the prosecution's cross-examination, it is entirely possible that he refrained from objecting to the cross-examination for tactical reasons. A review of the record indicates that defense counsel interposed appropriate objections at other times during the trial. On appeal, courts should be particularly careful not to second guess tactical decisions made by trial counsel. *See, e.g., Brown v. State*, 601 P.2d 221, 234 (Alaska 1979); *McCracken v. State*, 521 P.2d 499, 508–10 (Alaska 1974). Here, defense counsel was capable of rehabilitating his expert witness in an effective and professional manner. On redirect examination, defense

---

5. On cross-examination, Dr. Wolf explained that a surrogate sexual partner "is a person who involves themselves sexually as part of their therapy with people who don't have other partners who have sexual problems."

6. The state argues that these questions were within the scope of the direct examination. On direct, defense counsel asked Dr. Wolf how many evaluations he had done, if the state

often sought his services, and if his feelings were hurt if juries decided against his view of the cases. Arguably this opened the area of Dr. Wolf's prior testimony for the prosecution to explore; if the questions were at least arguably permissible then it is difficult to see how they could amount to plain error, since prejudice to the defense could not be viewed as "obvious."

counsel pointed out that in several of Dr. Wolf's prior cases which had been the subject of the prosecution's cross-examination, although verdicts of conviction were rendered by the jury, the verdicts were for lesser offenses than those charged in the indictment. The inference arising from this line of redirect examination was that, in those cases, the juries had not rejected Dr. Wolf's testimony. Additionally, defense counsel established on redirect that Dr. Wolf had testified in many cases other than the five specifically chosen by the prosecution, and that his testimony had often met with favorable results. While the prosecution, in its closing arguments to the jury, refrained from any specific comment on this line of cross-examination, defense counsel very ably argued to the jury that the prosecution had unfairly selected a sample of Dr. Wolf's cases that was not representative of the doctor's credibility in past cases. Furthermore, the five prior cases that Dr. Wolf was questioned about all involved alcohol amnestic syndrome, a diagnosis which is apparently somewhat novel and not universally accepted in the psychiatric field. As defense counsel made clear in his final argument to the jury, Dr. Wolf's conclusion in this case that Sheakley was incapable of forming the specific intent necessary for the offense of mayhem was not founded upon a belief that Sheakley suffered from alcohol amnestic syndrome.

Thus, having conducted a thorough review of the record on appeal, we are unable to say that the prosecution's improper cross-examination of Dr. Wolf concerning his testimony in prior cases was obviously prejudicial to Sheakley; for this reason, we conclude that it did not amount to plain error.

The impropriety of the prosecution's cross-examination of Dr. Wolf concerning both his use of a surrogate sexual partner in teaching a course on sexual dysfunction and his modeling of underwear is far more obvious. It is difficult to regard this line of inquiry as anything other than a blatantly improper attempt to discredit Dr. Wolf's overall credibility by questioning him as to irrelevant, potentially prejudicial collateral matters, which were calculated to make him look outlandish.[7] There can be little doubt that this line of inquiry by the prosecution should have been precluded if a proper objection had been made at trial.

■ Although we believe it to be regrettable indeed that the prosecution saw fit to resort to such a base and unwarranted personal attack against Dr. Wolf in an attempt to discredit his testimony, our decision as to whether this tactic constitutes plain error must, in the final analysis, turn upon the extent of actual prejudice to the defendant's case. As with the first line of improper cross-examination by the state, we must bear in mind the distinct possibility that defense counsel's failure to object may have been tactical. On redirect examination of Dr. Wolf, Sheakley's trial counsel was extremely effective in responding to the prosecution's attack on his witness. As we have pointed out, the potentially prejudicial aspect of questions concerning Dr. Wolf's use of a surrogate sexual partner in his teaching was to a large extent mitigated during the doctor's cross-examination, when he testified that he had never actually taught the course on sexual dysfunction and that, in any event, he had never contemplated having his students engage in active participation with a surrogate sexual partner, but had only planned to use a person who had served in this role to address his class. On redirect examination, defense counsel established that Dr. Wolf's plans to have a surrogate sexual partner speak to his class were in keeping with the highest professional standards of psychiatric instruction. Similarly, Sheakley's trial counsel was capable of bringing home to the jury, on redirect examination of Dr. Wolf, the absurdity of the prosecution's insinuations that Dr. Wolf's credibility as a witness might be impugned by his participation in modeling a

---

7. See, e.g., United States v. Lester, 248 F.2d 329, 334 (2d Cir. 1957):

> [A] party may not cross-examine a witness on collateral matters in order to show that he is generally unworthy of belief and may not introduce extrinsic evidence for that purpose . . . .

bathrobe and male underwear at a fashion show held in Anchorage to raise funds for the Anchorage Arts Council.[8]

The possibility of any significant prejudice to the defense from the prosecution's improper cross-examination of Dr. Wolf is, further, significantly diminished by the fact that no reference to this subject matter was made by the prosecution in its final argument. Conversely, Sheakley's trial counsel made forceful use of the obvious irrelevance of the prosecution's personal attack on Dr. Wolf in dealing with the issue of Dr. Wolf's credibility in the course of final argument.

The impact of the prosecution's improper cross-examination of Dr. Wolf was, in the first instance, a question to be assessed by Sheakley's trial counsel who was present and capable of observing the jury's reaction at the time the questions were asked. The subject matter of the improper questions was irrelevant to Dr. Wolf's primary testimony, and this irrelevance was so obvious that we cannot presume it escaped the attention of the jury. Upon review of Dr. Wolf's redirect examination and the final arguments made to the jury by Sheakley's trial counsel, we are left with the firm impression that the improper questioning did not substantially prejudice Sheakley's case. To the contrary, it would appear that Sheakley's trial counsel was capable of using the prosecution's irrelevant cross-examination of Dr. Wolf to the advantage of his client by emphasizing to the jury the broad range of Dr. Wolf's experience and expertise in research and teaching and by pointing out that Dr. Wolf was a person with creditable philanthropic interests. Given the totality of the record, we cannot say that the prosecution's improper attack on Dr. Wolf's personal character was obviously prejudicial, and given the absence of a timely objection, we must conclude that the improper cross-examination did not create plain error.

■ Sheakley's final challenge to the validity of his conviction pertains to the trial court's admission of the testimony of two witnesses, who stated that Sheakley had attempted to gouge their eyes in prior fights. Sheakley filed a pretrial protective motion objecting to the introduction of the testimony of these witnesses at trial. In this appeal, he contends this testimony was irrelevant to the issue of intent to commit mayhem, that it was too remote in time from the offense charged to indicate intent, and, alternatively, that it was more prejudicial than probative. The state responds that the testimony in question concerns incidents that were sufficiently similar to satisfy the relevance requirement and that this testimony showed that Sheakley's acts against Gorman were performed with the intent necessary to support a conviction for the offense of mayhem.

In ruling upon the admissibility of this testimony, the trial court was called upon to balance its probative value against the potential for prejudice which it created. Alaska R.Evid. 404(b);[9] see, e.g., Ladd v. State, 568 P.2d 960, 968 (Alaska 1977), cert. denied, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); Demmert v. State, 565 P.2d 155, 158 (Alaska 1977). On appeal, the ruling of the trial court is reviewable only for abuse of discretion. Ladd v. State, 568 P.2d at 968.

In Oksoktaruk v. State, 611 P.2d 521, 524–25 (Alaska 1980), the supreme court considered its previous cases regarding prior crimes evidence. It stated that its decisions had always been consistent with the

---

**8.** The skill and effectiveness displayed by trial counsel in this line of redirect examination serves not only to diminish any potential for prejudice stemming from the prosecution's improper cross-examination, but also indicates the possibility that the lack of a defense objection was tactical, rather than unintentional, in nature.

**9.** Alaska R.Evid. 404(b) provides:

*Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

principle that the rule pertaining to prior crimes evidence is one "of exclusion of evidence and not one of admission." *Id.* at 524. The court set forth the requirement that, when intent is an issue, prior crimes evidence must be nearly identical to the crime at issue and performed in an unusual or distinctive fashion. The state must be capable of showing an "affirmative link" between the crimes, and where a defendant does not affirmatively deny a culpable intent, there must be a particularly close similarity and proximity between the prior crimes and the offense charged. Conversely, the court has upheld the admission of evidence of prior crimes when a defendant has specifically denied culpable intent and when the prior crimes were committed "in a similar manner, under almost identical circumstances" as the crime charged. *Id.* at 525. When evidence of prior crimes is admitted on the issue of intent, it is essential that intent actually be in issue. *Freeman v. State,* 486 P.2d 967, 977 (Alaska 1971).

Here, Sheakley concedes that the primary issue at trial was his state of mind. The evidence of Sheakley's prior misconduct was not admitted in the state's case-in-chief. Rather, the defense presented witnesses who testified that, due to Sheakley's intoxication, he was incapable of forming the specific intent necessary to commit mayhem and that he was of a personality type likely to act impulsively under provocation, emotional stress, or influence of alcohol. It was only after this defense was advanced that the prosecution offered two witnesses to testify to Sheakley's conduct on prior occasions. Mickey Geary stated that, a year previously, he had gotten into an argument with Sheakley in a bar, they began wrestling on the floor and Sheakley attempted to gouge Geary's eyes. Richard Warren testified that he got into a verbal dispute with Sheakley in a bar two years prior to the crime charged. An hour-and-a-half after the dispute, Sheakley, who had been lying in wait for Warren outside the bar, threw Warren to the ground, knocked off his glasses and tried to put his fingers in Warren's eyes. Warren stated that he required medical treatment. In both cases,

bystanders pulled Sheakley away before serious damage was done. Upon conclusion of this testimony, the trial court gave an appropriate instruction to the jury, limiting the evidence only to the issue of Sheakley's intent in the present case.

Sheakley contends that these incidents were insufficiently similar to the offense charged to be admissible. Specifically, he asserts that, unlike the prior cases, in the case at bar he was severely intoxicated, his relationship with Ms. Peterson was causing him severe emotional strain, and he felt that he was in a life-and-death struggle with Officer Gorman. However, we believe that the jury could infer, from the fact that the two prior fights originated in bars, that Sheakley had been drinking at those times also. The jury might also have chosen to disbelieve Sheakley's testimony that Officer Gorman attacked him and that he felt his life was in danger, especially since Gorman testified that he took no aggressive action against Sheakley until Sheakley had knocked him down and was sitting on top of him, already engaged in his assault. As to the significance of Sheakley's relationship with Peterson, the testimony of the defendant's own expert witnesses established that Sheakley had a tendency of acting impulsively under provocation, either when he was in emotional turmoil or when he was under the influence of alcohol. Thus, we are not convinced that the peculiar circumstances of the offense charged rendered the evidence of Sheakley's prior misconduct inadmissible.

Both the prior incidents and the offense charged involved fights in or directly outside bars after a verbal dispute. In each instance, Sheakley initiated the physical attack by knocking the other person to the ground, then sat on top of the person and attempted to put his fingers into the person's eyes. From these similarities between Sheakley's prior incidents and the offense charged, we believe that the jury could fairly infer that Sheakley was aware that gouging a person's eyes can be a particularly effective fighting technique, capable of causing great pain and inflicting disabling

injuries. In analogous circumstances, we have recently had occasion to hold that the probative value on the issue of intent of a defendant's prior misconduct outweighed the potential for prejudice that it created and was therefore admissible. *Davis v. State*, 635 P.2d 481, 485 (Alaska App.1981). Here, as in *Davis*, we believe that the probative value of the prior crimes evidence on the issue of intent substantially outweighed its potential for prejudice. Thus, we find no basis for concluding that the trial court abused its discretion in admitting the testimony regarding Sheakley's prior misconduct.

Sheakley separately argues that the sentences he received were excessive. He maintains that the trial court could not properly have considered him a worst offender and that his maximum sentence of twenty years for the offense of mayhem was thus improper. He further asserts that the trial court failed to give adequate consideration to his rehabilitation, that consecutive sentences for mayhem and ADW were uncalled for, and that the trial court was clearly mistaken in imposing an aggregate sentence of twenty-seven years' imprisonment.

 Sheakley's first contention can be dispensed with quickly. Although it is well established that imposition of a maximum sentence is justified only for persons falling within the category of worst offenders, *see, e.g., Galaktionoff v. State*, 486 P.2d 919, 924 (Alaska 1971), Sheakley is mistaken in asserting that the twenty years' imprisonment he received for mayhem was a maximum sentence. Because Sheakley had been convicted in 1974 of burglary not in a dwelling, a felony, he was separately indicted and convicted in the present case under the

provisions of Alaska's habitual criminal statutes.[10] Thus, upon Sheakley's conviction for mayhem, the maximum sentence of imprisonment authorized was forty years, twice the period normally provided for the offense.[11] Accordingly, the trial court was under no obligation to make a specific finding that Sheakley was a worst offender in imposing a twenty-year sentence for his conviction of mayhem.

 Sheakley's argument that consecutive sentences for assault with a dangerous weapon and mayhem were improper must also be rejected under the circumstances of this case. In making this argument, Sheakley relies primarily on *Cooper v. State*, 595 P.2d 648 (Alaska 1979). He does not argue that consecutive sentencing was *per se* impermissible, but only that, since the evening's events could be characterized as a continuous course of conduct, the imposition of consecutive sentences constituted an abuse of discretion and resulted in an aggregate sentence that was excessive. However, we find that Sheakley's case is easily distinguishable from the situation presented in *Cooper*. There, the defendant fired five shots in rapid succession at three police officers. He was charged separately with assault on each officer and, upon conviction, was sentenced to ten years on each count, to be served consecutively. Although the court in *Cooper* found that there was a separate act and intent for each incident, it held that imposition of consecutive maximum penalties was unjustified, since Cooper was not a worst offender. The court also noted that consecutive sentences were inappropriate because Cooper's convictions resulted from a single criminal episode. *Id.* at 650.

10. Former AS 12.55.050 and 12.55.060.

11. The pertinent portion of former AS 12.55.-050 provided:

> *Increased punishment for persons convicted of more than one felony.* A person convicted of a felony in this state who has been previously convicted of a felony in this state or elsewhere, if the same crime elsewhere would constitute a felony under Alaska law, is punishable as follows:

> (1) If the person is convicted of a felony which would be punishable by imprisonment for a term less than his natural life, and has previously been convicted of one felony, then he is punishable by imprisonment for not less than the minimum nor more than twice the longest term prescribed for the felony of which that person is convicted.

Unlike the situation in *Cooper*, here the court did not impose maximum sentences, and the aggregate of the consecutive sentences imposed in this case did not exceed the maximum of forty years which the court was authorized to impose for Sheakley's conviction of mayhem. Furthermore, the crimes committed by Sheakley were much less a part of a single, continuous episode than the crimes involved in *Cooper*. Sheakley's two offenses were separated in time: after his assault on Ms. Peterson and before his attack on Officer Gorman, enough time elapsed for Sheakley to have calmed down. Additionally, the offenses here were of a different nature and were directed not at a group, but at two individuals who stood in very different relationships to Sheakley. Under these circumstances, we cannot conclude that the imposition of consecutive sentences was clearly mistaken. *See Neal v. State*, 628 P.2d 19, 21 (Alaska 1981); *Davenport v. State*, 543 P.2d 1204, 1210 (Alaska 1975).

We turn, finally, to Sheakley's arguments that the trial court failed to give sufficient weight to rehabilitation in imposing his sentence and that the total length of his sentence was excessive.

■ A review of the sentencing record indicates that the trial court did not neglect the criterion of rehabilitation in fashioning Sheakley's sentence. To the contrary, the court gave consideration to rehabilitation, particularly to Sheakley's need for assistance with respect to his alcohol problem. The court concluded that Sheakley was a person who is ordinarily capable of controlling his conduct, but who becomes violent under the influence of alcohol. The court noted, however, that Sheakley had not availed himself of an alcohol treatment program while on probation following his prior conviction of burglary. The court indicated that it could not accurately predict whether Sheakley could successfully deal with his problem and refrain from drinking to excess again. Because of Sheakley's five prior misdemeanors, including four assaults, and his prior burglary conviction, the trial court ultimately concluded that his chances for rehabilitation were poor; based on the information before it, the court further found that changes in Sheakley's attitude would be necessary before successful rehabilitation could be considered a realistic possibility. Sheakley argues that the trial court gave scant consideration to psychological evidence advising against lengthy incarceration. However, the balancing of such information is primarily a task for the sentencing court, and that court need not give predominate weight to any single criterion. *See Asitonia v. State*, 508 P.2d 1023, 1026 (Alaska 1973). Based on the record before us, we cannot find that the trial court was clearly mistaken in concluding that Sheakley's rehabilitation should not be given paramount consideration in arriving at an appropriate sentence.

■ The court based its sentence primarily on the heinous and aggravated nature of the acts involved in Sheakley's assault on Ms. Peterson and Officer Gorman. Judge Schulz was convinced that Sheakley posed a significant danger to society. He specifically found that the assault on Ms. Peterson was deliberate, without provocation, and as aggravated as it could have been given the nature of the weapon used (Sheakley's boots). Judge Schulz found that the attack on Officer Gorman was also deliberate and unprovoked, and that it was "as serious and as horrible an injury as one person can inflict on another." Although a motion to modify the original sentence was presented to the court based on a stipulation that Officer Gorman's vision was better than believed at the time of sentencing, Judge Schulz declined to alter the sentence. After reviewing the psychiatric and trial testimony, the judge held to his conclusion that Sheakley's attack on Officer Gorman was unprovoked, dangerous, violent and a part of a pattern in Sheakley's life. Judge Schulz indicated that, for these reasons, he saw no reason to reduce Sheakley's sentence by mere virtue of the fact that Officer Gorman was managing to make a better recovery than originally anticipated.

Having independently reviewed the record of proceedings below, we believe that

the conclusions reached by the trial court in fashioning Sheakley's sentence are amply supported. We find nothing to support a conclusion that the court was clearly mistaken in placing the greatest emphasis in sentencing upon the need to isolate Sheakley from society.

Accordingly, we hold that Sheakley's conviction and his sentence must be AFFIRMED.